**Richard John JAHNKE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 83–70.

Supreme Court of Wyoming.

June 6, 1984.

992

James H. Barrett of Trierweiler, Bayless, Barrett & McCartney, Cheyenne, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Dennis C. Cook, Asst. Atty. Gen., Thomas J. Carroll, Dist. Atty., Allen C. Johnson, Sr. Asst. Atty. Gen., and John Forwood, Deputy Dist. Atty., First Judicial Dist., for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

THOMAS, Justice.

The essential questions presented in this case arise out of a notion that a victim of abuse has some special justification for patricide. The specific questions posed relate to limitations imposed by the trial judge upon voir dire examination of members of the selected panel of jurors and the admissibility of testimony from a forensic psychiatrist intended to support the theory of self-defense espoused by the appellant, Richard John Jahnke. In addition there is a claim that the district judge abused his discretion in imposing sentence upon a conviction of voluntary manslaughter which was the result of the jury's deliberations. The district judge refused to permit counsel for the defendant to inquire of members of the panel of jurors about their attitudes with respect to specific conduct of the deceased father in disciplining his children both physically and psychologically or to inquire whether any member of the jury panel felt that there was no justification ever for the taking of a human life. The district court also ruled that the forensic psychiatrist could not testify about statements made to him by the appellant. After the jury's verdict was returned and an appropriate presentence investigation was completed and reviewed the district judge sentenced the appellant to a term of not less than five years nor more than fifteen years in the Wyoming State Penitentiary.

This sentence was imposed even though the appellant was sixteen years of age at the time the offense was committed. We have concluded that there was no error with respect to the respective rulings made by the district court in connection with this case, and that the court did not abuse its discretion in the imposition of sentence. We shall affirm the conviction and the judgment and sentence entered thereon.

The case is not remarkable so far as the procedural steps are concerned. The appellant's father, Richard Chester Jahnke, died on November 16, 1982, as a result of gunshot wounds. Those gunshot wounds were inflicted by the appellant, and that fact has never been an issue in this case. On November 18, 1982, a criminal complaint was filed in the County Court for Laramie County charging the appellant with first degree murder[1] and with conspiring with his sister, Deborah Ann Jahnke, to commit first degree murder.[2] On the same date that the complaint was filed the appellant was arrested; he was given appropriate advice with respect to his constitutional rights; and he was informed of the charges against him. On November 22, 1982, an appearance bond was set in the amount of $50,000, and the appellant was released the following day. He waived his right to a preliminary hearing which earlier had been set for November 29, 1982, and an Information which encompassed the same charges as the criminal complaint was filed in the District Court of the First Judicial District in and for Laramie County on December 1, 1982.

Arraignment was set for December 3, 1982, but on December 2, 1982, a number of motions were filed on behalf of the appellant, including a Motion to Transfer to Juvenile Court System and a motion to continue the arraignment until after the court had ruled upon the transfer motion. The appellant was arraigned on December 3, 1982, as scheduled, and he entered a plea of not guilty to both charges in the Information. At that time the State of Wyoming advised the court that it would not seek the death penalty in the case, and a hearing on the transfer motion filed by the appellant was set for January 10, 1983. After the appellant peremptorily challenged the district judge to whom the case had been assigned, the hearing on his pending motions was reset for January 17, 1983. Ultimately the hearing on the motions was continued until January 21, 1983, at the behest of the appellant.

A two-day hearing was conducted with respect to the appellant's motions, and at that hearing he presented evidence and psychiatric testimony demonstrating that he had suffered from mental and physical abuse at the hands of his father over a long period of his life. Following the hearing, however, the court denied the appellant's motion to transfer the case to juvenile court, and it was set for trial on February 14, 1983. The trial began as scheduled on February 14, 1983, and the case was submitted to the jury on February 19, 1983. The jury, by its verdict, found the appellant not guilty of the charge of conspiracy to commit first degree murder, and found him guilty on the first degree murder count of the lesser included offense of voluntary manslaughter. The appellant then filed a Motion for Judgment of Acquittal and New Trial together with a Motion and Application for Bail Pending Sentence, and both of

1. Section 6-1-101, W.S.1977, in effect at the time this offense was committed, provided:

"(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, sexual assault, arson, robbery or burglary, or by administering poison or causing the same to be done, kills any human being, or whoever purposely and with premeditated malice kills any peace officer, corrections employee or fireman acting in the line of duty, is guilty of murder in the first degree.

"(b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law."

2. Section 6-1-203(a), W.S.1977 (1982 Cum. Supp.), in effect at the time this offense was committed, provided:

"A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons to commit a crime and he or another person does an overt act to effect the object of the agreement."

these motions were denied. The presentence investigation was ordered, and sentencing was set for March 18, 1983. The trial judge imposed the sentence of a term of not less than five years nor more than fifteen years in the state penitentiary, and the written Judgment and Sentence of the court was entered on March 21, 1983. It is from this judgment and sentence that the appellant has taken this appeal.

In his brief in this appeal the appellant articulates three issues which he asks the court to resolve. These are stated in that brief as follows:

"I. DID THE COURT ERR IN RESTRICTING DEFENDANT'S VOIR DIRE, THEREBY DENYING DEFENDANT THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, A FAIR AND IMPARTIAL JURY AND A FAIR TRIAL?

"II. DID THE COURT ERR IN DENYING DEFENDANT THE RIGHT TO PRESENT EXPERT PSYCHIATRIC TESTIMONY IN HIS DEFENSE?

"III. DID THE COURT ERR AND ABUSE ITS DISCRETION IN SENTENCING?"

The State of Wyoming, as appellee, substantially agrees with the appellant as to the issues, but it attaches a different emphasis to them in stating the issues in its brief as follows:

"I. DID THE TRIAL COURT ACT WITHIN THE SCOPE OF ITS DISCRETION WHEN IT REFUSED TO ALLOW APPELLANT TO ASK CERTAIN QUESTIONS DURING VOIR DIRE?

"II. DID THE TRIAL COURT ACT WITHIN THE SCOPE OF ITS DISCRETION WHEN IT REFUSED TO ALLOW DR. McDONALD'S PSYCHIATRIC TESTIMONY?

"III. WAS THE SENTENCE APPELLANT RECEIVED FOR KILLING HIS FATHER EXCESSIVE?"

The material facts relating to the death of the appellant's father can be briefly stated. On the night of his death the father took the mother out to dinner, apparently to celebrate the anniversary of their meeting. Earlier the appellant had been involved in a violent altercation with his father, and he had been warned not to be at the home when the father and mother returned. During the absence of his parents the appellant made elaborate preparation for the final confrontation with his father. He changed into dark clothing and prepared a number of weapons which he positioned at various places throughout the family home that he selected to serve as "backup" positions in case he was not successful in his first effort to kill his father. These weapons included two shotguns, three rifles, a .38 caliber pistol and a Marine knife. In addition, he armed his sister, Deborah, with a .30 caliber M–1 carbine which he taught her how to operate so that she could protect herself in the event that he failed in his efforts. The appellant removed the family pets from the garage to the basement to protect them from injury in a potential exchange of gunfire between him and his father, and he closed the garage door. He then waited inside the darkened garage in a position where he could not be seen but which permitted him to view the lighted driveway on the other side of the garage door. Shortly before 6:30 p.m. the parents returned, and the appellant's father got out of the vehicle and came to the garage door. The appellant was armed with a 12-gauge shotgun loaded with slugs, and when he could see the head and shoulders of his father through the spacing of the slats of the shade covering the windows of the garage door, he blew his R.O.T.C. command-sergeant-major's whistle for courage, and he opened fire. All six cartridges in the shotgun were expended, and four of them in one way or another struck the father. The most serious wound was caused by a slug which entered the father on the right chest just above and to the inside of the right nipple, followed a trajectory which took it through the right rib cage and the right lobe of the liver, bruising the right lung and tearing the diaphragm along the way, into the middle of the chest cavity where it passed behind the heart nearly severing the aorta,

inferior vena cava and the esophagus, then through the lower lobe of the left lung, finally lodging just under the skin in the mid-part of the victim's back. About one hour after the shooting incident the father was pronounced dead from the wounds inflicted by the appellant.

After the shooting, and while the mother still was screaming in the driveway, the appellant and his sister exited the family home through a window in the mother's bedroom, which was at the far end of the house from the garage. The appellant and his sister then went separate ways, and the appellant was arrested at the home of his girl friend. Prior to the arrival of authorities the appellant told his girl friend's father that he had shot his dad for revenge. Subsequently, after being advised of his constitutional rights, the appellant made a statement in which he explained he had shot his father "for past things."

Prior to dealing with the specific issues raised by the appellant his theory of defense should be put in perspective. Appellant has cited to us the case of *Buhrle v. State*, Wyo., 627 P.2d 1374 (1981), which involved a homicide by a wife who claimed to be a victim of abuse. The cases which are cited in *Buhrle v. State*, supra, lead into a series of cases involving homicides committed by women who were perceived as being victims of the "battered-wife syndrome." While those cases deal with wives as victims of abuse, conceptually there is no reason to distinguish a child who is a victim of abuse. A perusal of those cases leads to a conclusion that the effort which is made on behalf of the defendants is to secure the recognition of a special defense in a homicide case for victims of family abuse. Succinctly stated, the attempt that is made is to establish the concept that one who is a victim of family abuse is justified in killing the abuser.

■ The departure of this theory from the usual requirements of self-defense is patent. In *Garcia v. State*, Wyo., 667 P.2d 1148 (1983), the prior decisions of this court with respect to the defense of self-defense were collected. There we said:

"We can identify several articulations of the rule of self-defense, and it may be that they are not definitive.

"' * * * Self-defense will justify a homicide when a reasonable person deems it necessary in order to avoid infliction of death or great bodily harm upon his or her person. To justify a homicide on this ground, it must appear that the defendant was in great peril of death or serious bodily harm, or had reasonable grounds for so believing. It must appear that the killing was a necessary and reasonable means of avoiding the threatened harm, and the facts and circumstances surrounding the event must be such as to afford such grounds for that belief.' *Leeper v. State*, supra [Wyo., 589 P.2d 379 (1979)], 589 P.2d at 382.

"'It has been said several times in this jurisdiction that to justify a homicide on the ground of self-defense, it must appear the defendant was in great peril of death or serious bodily harm, or had reasonable ground for believing and did believe he was in such peril, and the killing was necessary to avert such peril, and no other reasonable means of avoiding it was open to him. * * *' *Nunez v. State*, supra [Wyo., 383 P.2d 726 (1963)], 383 P.2d at 727.

"'The law of self defense is founded upon necessity. To justify a homicide, it must appear that the slayer was in great peril of death or serious bodily harm, or had reasonable ground for believing and did believe, that he was in such peril and that the killing was necessary to avert such peril, and that no other reasonable means of avoiding it was open to him. * * *' *Durham v. State*, supra [29 Wyo. 85, 210 P. 934 (1922)], 29 Wyo. at 96, 210 P. at 938.

"'' * * * That to justify the taking of human life in self-defense, it must appear from the evidence that the defendant not only really, and in good faith, endeavored to decline any conflict with the deceased, and to escape from his assailant, if he had the opportunity so to do, if he was assailed, before he fired the shot in ques-

tion, but it must also appear that the circumstances were such as to excite the fears of a reasonable person that the deceased intended to take his life, or to inflict upon him great bodily harm, and that the defendant really acted under the influence of such fears, and not in a spirit of revenge. * * *' *Ross v. State,* supra [8 Wyo. 351, 57 P. 924 (1899)], 8 Wyo. at 383, 57 P. at 931."

It is clear that self-defense is circumscribed by circumstances involving a confrontation, usually encompassing some overt act or acts by the deceased, which would induce a reasonable person to fear that his life was in danger or that at least he was threatened with great bodily harm.

■ This same circumstantial circumscription is discernible in the line of cases involving abused or battered wives. See *Ibn-Tamas v. United States,* D.C.App., 407 A.2d 626 (1979); *Smith v. State,* 247 Ga. 612, 277 S.E.2d 678, 18 A.L.R.4th 1144 (1981); *State v. Griffiths,* 101 Idaho 163, 610 P.2d 522 (1980); *People v. Adams,* 102 Ill.App.3d 1129, 58 Ill.Dec. 325, 430 N.E.2d 267 (1981); *People v. White,* 90 Ill.App.3d 1067, 46 Ill.Dec. 474, 414 N.E.2d 196 (1980); and *State v. Thomas,* 66 Ohio St.2d 518, 20 Ohio Op.3d 424, 423 N.E.2d 137 (1981). The circumstances surrounding the killing are not set forth in either opinion of the Florida Appellate Court in *Hawthorne v. State,* Fla.App., 377 So.2d 780 (1979) or in *Hawthorne v. State,* Fla.App., 408 So.2d 801 (1982). Although many people, and the public media, seem to be prepared to espouse the notion that a victim of abuse is entitled to kill the abuser that special justification defense is antethetical to the mores of modern civilized society. It is difficult enough to justify capital punishment as an appropriate response of society to criminal acts even after the circumstances have been carefully evaluated by a number of people. To permit capital punishment to be imposed upon the subjective conclusion of the individual that prior acts and conduct of the deceased justified the killing would amount to a leap into the abyss of anarchy.

■ In *People v. White,* supra, and *State v. Thomas,* supra, the courts suggest that the true role of any evidence with respect to family abuse is to assist the jury to determine whether the defendant's belief that he was in danger of his life or serious bodily injury was reasonable under the circumstances. In those cases the courts indicate that expert testimony with respect to such an issue is neither necessary nor relevant and for that reason is best eschewed. It is clear that if such evidence has any role at all it is in assisting the jury to evaluate the reasonableness of the defendant's fear in a case involving the recognized circumstances of self-defense which include a confrontation or conflict with the deceased not of the defendant's instigation.

It is in the context of the defendant's theory of self-defense as it should be contrasted with the self-defense theory which is supported by precedent that we examine the specific claims of error made with respect to the voir dire examination of the jury panel and the admissibility of the expert testimony.

## THE VOIR DIRE EXAMINATION OF THE JURY PANEL

A brief review of the law in Wyoming with respect to voir dire examinations of members of a jury panel is appropriate here. The substantive grounds for challenging a juror for cause in a criminal case are encompassed in § 7-11-105, W.S.1977:

"(a) The following shall be good cause for challenge to any person called as a juror on any indictment:

"(i) That he was a member of the grand jury which found the indictment;

"(ii) That he has formed or expressed an opinion as to the guilt or innocence of the accused, or is biased or prejudiced for or against the accused;

"(iii) In indictments for an offense, the punishment whereof is capital, that his opinions are such as to preclude him from finding the accused guilty of an offense punishable with death;

"(iv) That he is a relation within the fifth degree to the person alleged to be injured, or attempted to be injured, by the offense charged or to the person on whose complaint the prosecution was instituted, or to the defendant;

"(v) That he has served on a petit jury which was sworn in the same cause against the same defendant, and which jury either rendered a verdict which was set aside, or was discharged after hearing the evidence;

"(vi) That he has served as a juror in a civil case brought against the defendant for the same act;

"(vii) That he has been subpoenaed as a witness in the case.

"(b) The same challenges for cause shall be allowed in criminal prosecutions that are allowed to parties in civil cases."

The challenges for cause in a civil case adopted by reference are found in § 1–11–203, W.S.1977, which provides:

"(a) Challenges for cause may be taken on one (1) or more of the following grounds:

"(i) A lack of any of the qualifications prescribed by statute which render a person competent as a juror;

"(ii) Relationship by consanguinity or affinity within the third degree to either party;

"(iii) Standing in the relation of debtor or creditor, guardian or ward, master or servant, or principal or agent to either party, or being a partner united in business with either party, or being security on any bond or obligation for either party;

"(iv) Having served as a juror or a witness in a previous trial between the same parties for the same cause of action, or being then a witness therein;

"(v) Interest on the part of the juror in the event or question involved in the action, but not an interest of the juror as a member or citizen of a municipal corporation;

"(vi) Having formed or expressed an unqualified opinion or belief as to the merits or the question of the action. The reading of newspaper accounts of the subject matter before the court shall not disqualify the juror either for bias or opinion;

"(vii) The existence of a state of mind in the juror evincing enmity or bias for either party."

The procedure with respect to jury selection now is found in Rule 25, W.R.Cr.P., which provides in pertinent part as follows:

"(a) *Examination of jurors.*—The parties, or their attorneys, may conduct the examination of prospective jurors, but such examination shall be under the supervision and control of the court, and the court may itself conduct such further examination as it deems proper. (See Rule 17, D.Ct.)

"(b) *Peremptory challenges.*—In every case, including the selection of alternate jurors, the state shall be entitled to the aggregate number of peremptory challenges to which the defendant or defendants are entitled. If the offense charged is punishable by death, each defendant shall be entitled to 12 peremptory challenges. If the offense charged is punishable by imprisonment for more than one (1) year, each defendant shall be entitled to 8 peremptory challenges. If the offense charged is a misdemeanor, each defendant shall be entitled to 4 peremptory challenges."

This rule is supplemented by Rule 17 of the Uniform Rules for the District Courts of the State of Wyoming, which was invoked by the trial judge in this case, and provides as follows:

"The only proper purpose of voir dire of jurors is to select a panel of six (6) jurors in a civil case, twelve (12) jurors if specific demand is made, and twelve (12) jurors in a criminal case, who will fairly and impartially hear the evidence presented and render a just verdict and to determine the ground for any challenge for cause prescribed by §§ 1–121 (civil) or 7–224 (criminal), W.S.1957 [§ 1–11–203 (civil) or § 7–11–105 (criminal)], as modified by judicial decision. Counsel will not:

"1. Ask questions of an individual juror that are susceptible of being asked collectively;

"2. Ask questions covered by and answered in juror questionnaire except to explore some questionnaire answer in greater depth;

"3. Repeat question asked and answered, though asked by opposing counsel;

"4. Use voir dire for the purpose of attempting to instruct the jury on the law; that is the court's function;

"5. Use voir dire for the purpose of arguing the case;

"6. Ask a juror what his verdict might be under any hypothetical situation based upon any expected evidence or otherwise.

"Upon failure of counsel to abide by this rule, the court may assume voir dire of the jury. The court may in such case require counsel to submit in writing, specific questions to be asked by the court."

■ The object of voir dire examination of members of the jury panel is to explore the possibility that a prospective juror is subject to a challenge for cause under our statutes quoted above. *Lopez v. State,* Wyo., 544 P.2d 855 (1976). Voir dire examination is designed to insure the right to a fair and impartial jury by affording the parties the opportunity to discover potential prejudices and biases which would interfere with the ability of potential jurors to fairly decide the case, and the preservation of that right to prove actual bias is an integral portion of the right of a defendant to an impartial jury. *Dennis v. United States,* 339 U.S. 162, 164, 70 S.Ct. 519, 521, 94 L.Ed. 734, 737 (1950), reh. denied 339 U.S. 950, 70 S.Ct. 799, 94 L.Ed. 1364 (1950); *Lopez v. State,* supra. Of the statutory grounds for challenge for cause with respect to prospective jurors in a criminal case the most significant well may be "bias or prejudice for or against the accused." Section 7–11–105(a)(ii), W.S.1977. The entitlement is to a fair and impartial jury, not one sympathetic to the defendant. " 'Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.' " *Dennis v. United States,* supra, 339 U.S. at 172, 70 S.Ct. at 523, quoting from *United States v. Wood,* 299 U.S. 123, 145–146, 57 S.Ct. 177, 185, 81 L.Ed. 87 (1936).

■ The appellant and the appellee acknowledge that the trial court is vested with broad discretion concerning the questioning of potential jurors during voir dire. Rule 25(a), W.R.Cr.P.; *Hopkinson v. State,* Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Lopez v. State,* supra; and *Gerard v. State,* Wyo., 511 P.2d 99 (1973), cert. denied 414 U.S. 1072, 94 S.Ct. 585, 38 L.Ed.2d 478 (1973). The only inhibition regarding the discretion of the trial court is that it must be exercised subject to the essential demands of fairness. *Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). In deference to the discretion of the trial court, appellate courts have not been inclined to prescribe rigid rules with respect to the conduct of voir dire examinations. *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981); *Gerard v. State,* supra. It is the trial court which assumes primary responsibility for the selection of jurors who will be able to follow its instructions on the law and evaluate the evidence without bias or prejudice to either side, and it is necessary as a pragmatic proposition to rely upon discretion of the trial court in performing that task. As the Supreme Court said in *Rosales-Lopez v. United States,* supra, 451 U.S. at 188, 101 S.Ct. at 1634:

"Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. See *Ristaino v. Ross,* 424 U.S. 589, 595, 96 S.Ct. 1017,

1020, 47 L.Ed.2d 258 (1976), quoting *Rideau v. Louisiana,* 373 U.S. 723, 733, 83 S.Ct. 1417, 1422, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting). In neither instance can an appellate court easily second-guess the conclusions of the decision-maker who heard and observed the witnesses."

The impartiality of the jurors is a question of fact to be decided by the trial court upon the basis of proper questioning.

 Further, the party contesting the rulings of the trial court with respect to the scope and content of voir dire examination of jurors is obligated to establish not only an abuse of the trial court's proper discretion, but he must demonstrate substantial prejudice to his rights as a result of that abuse of discretion. *United States v. Robinson,* 154 U.S.App.D.C. 265, 475 F.2d 376 (1973). See also *Hopkinson v. State,* supra; *Collins v. State,* Wyo., 589 P.2d 1283 (1979); *Lopez v. State,* supra; *Loy v. State,* 26 Wyo. 381, 185 P. 796 (1919); and *Keffer v. State,* 12 Wyo. 49, 73 P. 556 (1903). While in this case we can perceive no prejudice to the rights of the appellant with respect to the court's rulings in connection with voir dire examination of the jurors, we do not reach that question in light of our conclusion that in this instance no abuse of discretion was demonstrated.

The appellant contends that the trial court abused its discretion in two areas: (1) that the district judge improperly limited areas of questioning relating to discipline of children which could be perceived as abusive; and (2) that the district court improperly refused to permit him to question jurors about their attitudes with respect to justification for the taking of a human life. There is also presented a corollary argument by the appellant to the effect that the restrictions upon his questioning inhibited the exercise of his peremptory challenges of members of the jury panel.

With respect to his first claim relating to voir dire examination, counsel for the appellant informed the court prior to the beginning of jury selection that he wanted to ask jurors how they disciplined their children if they had children. He was permitted to ask that question, but he also indicated that he wanted to inquire of the jurors whether they thought it would be proper discipline to strike a child of the age of two; whether it would be proper discipline or proper parental conduct to lie on top of your daughter when she is eleven years old and put your hands in her pants; whether it would be proper to strike your children with a closed fist on the back; and, in the area of mental or psychological abuse, whether it would be proper to put down children who are very young, swear at them and cuss at them. The trial court, as noted, permitted the question with respect to the manner of discipline of their children, but refused to permit counsel to ask the other questions, stating that it constituted indirectly asking them for their reaction to expected evidence which the district judge perceived to be contrary to the provisions of Rule 17 of the Uniform Rules of the District Courts quoted above. In connection with the request to inquire about mental or psychological abuse, the court ruled that in its judgment that amounted to attempting to try the appellant's case during the voir dire examination.

 In the context of this case there was no abuse of discretion in the refusal of the trial court to permit the specific questions that appellant desired to raise with the members of the. jury panel. *Gerard v. State,* supra. The trial court is not required to permit improper questioning of the jury panel simply because a party requests permission to ask such questions, and no specific method of questioning is prescribed for voir dire examinations. *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); *Aldridge v. United States,* supra. The questions which appellant sought to ask were not designed to reveal any hidden bias or prejudice on the part of members of the jury panel. They were patent requests to obtain the reaction of potential jurors to the appellant's theory of defense in the case and to anticipated evidence. The trial

court was well within the limits of its discretion in refusing to permit such questions to be asked.

With respect to the request to inquire of the panel whether any of them felt that there is no justification ever for the taking of a human life, counsel for the appellant advised the district court that the reason he wanted to ask that question was to ascertain whether the members of the panel would be able to follow the court's instruction concerning self-defense if such an instruction were given. At that particular time there was pending before the court a motion in limine filed by the State which sought a ruling that an instruction on self-defense would be improper under the circumstances of this case. The trial court, however, did not rely upon the position of the State, but ruled that it would be improper to permit a question on potential instructions and that such questioning defeated the purpose of the uniform rule of the District Courts. Appellant relies upon *State v. Brown*, Mo., 547 S.W.2d 797 (1977), but with all due respect to our brothers on the Supreme Court of Missouri we decline to follow that rule. Prior to the voir dire examination by counsel the district judge in this case had inquired of the jury if any of them could not accept the law in the case as given to them by the court, even though they might disagree with the law as they were instructed, and no one indicated any difficulty in following the instructions of the court. Consequently the approach taken by the court with respect to limiting questions about legal theories which might later be incorporated in instructions was a proper exercise of the court's discretion in this case.

The appellant, however, also seeks to structure an analogy to cases in which capital punishment is sought and the right of the State to inquire during voir dire whether any of the prospective jurors could not impose a death penalty under any circumstances. We note that that is a statutory subject of challenge for cause in Wyoming. Section 7–11–105(a)(iii), W.S.1977. The inquiry has been specifically approved in the jurisprudence of this state and the United States. *Witherspoon v. State of Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), reh. denied 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968); *Hopkinson v. State*, supra; *Pixley v. State*, Wyo., 406 P.2d 662 (1965); and *State v. Aragon*, 41 Wyo. 308, 285 P. 803 (1930). It is appellant's position that like the capital punishment question he should have been allowed to determine, by asking potential jurors during voir dire, what their attitudes might be toward self-defense in order to discover whether they had closed minds with respect to a particular outcome. In this regard we find the following language from *Commonwealth v. Fisher*, 447 Pa. 405, 290 A.2d 262, 264–265 (1972), to be instructive and apt:

"Appellant's first contention is that it was an abuse of discretion for the trial court to deny him the opportunity to examine prospective jurors as to their ability to apply the law of self-defense. He attempts to create an analogy between the Commonwealth's right to ask prospective jurors whether under certain circumstances they could impose the death penalty and this defendant's claimed right to ascertain whether a juror could apply the law of self-defense. Cf. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

"The trial court specifically inquired of every prospective juror whether if selected as a juror that individual could abide by the court's instructions as to the law on every aspect of the case. Appellant's asserted symmetry between the permitted voir dire examination involving the death penalty and his requested voir dire on the subject of self-defense has no legal or factual basis. There has been no showing of a widespread public concern with a juror's ability to impartially and fairly apply the law of self-defense similar to that involving the imposition of the death penalty. Cf. *Witherspoon v. Illinois*, 391 U.S. at 519, 88 S.Ct. at 1775–1776. Absent such a showing or any reasonable basis for the requested extension of the present permissible limits of voir dire we cannot say that the trial

court abused its discretion in refusing to allow defense counsel to probe into this area. See *Commonwealth v. Lopinson,* 427 Pa. 284, 234 A.2d 552 (1967); ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury, § 2.4 (Approved Draft, 1968) ("The judge should then [on voir dire] put to the prospective jurors any questions which he thinks necessary....')"

We conclude that there was no error in refusing permission to the appellant to inquire about the jurors' attitudes with respect to his theory of self-defense. There is ample authority for the proposition that it is not an abuse of discretion to refuse questioning on propositions of law or instructions that might be given at the conclusion of the trial. *United States v. Gillette,* 383 F.2d 843 (2nd Cir.1967); *Stone v. United States,* 324 F.2d 804 (5th Cir.1963), cert. denied 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 649 (1964); *United States v. Crawford,* 444 F.2d 1404 (10th Cir.1971), cert. denied 404 U.S. 855, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Hart v. State,* 137 Ga.App. 644, 224 S.E.2d 755 (1976); *State v. Clark,* La., 325 So.2d 802 (1976); *Carder v. State,* 5 Md.App. 531, 248 A.2d 495 (1968); *Oliver v. State,* 85 Nev. 418, 456 P.2d 431 (1969); and *Commonwealth v. Fisher,* supra. Here there was no showing made of any special circumstances which required that questions be asked with respect to the issue of self-defense, i.e., that such questioning was reasonably calculated to discover an actual and likely source of prejudice. See *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *United States v. Robinson,* supra; and *Commonwealth v. Fisher,* supra. Subsections (4) and (6) of Rule 17, Uniform Rules for the District Courts of the State of Wyoming, for the guidance of counsel and the courts in this jurisdiction, specifically prohibit attempts to use voir dire for the purpose of instructing the jury with respect to applicable law or determining what a juror's verdict might be under a hypothetical situation.

 In this instance we also ascribe significance to the fact that at the time the appellant sought to inquire with respect to the issue of self-defense, the court did not know whether the evidence would justify an instruction on that issue. By virtue of its motion in limine and otherwise the State was contending that it would not. The trial court also had the benefit of testimony taken at the hearing directed at the issue of transfer of the case to the juvenile court. We have held that the trial court need only instruct on a defendant's theory of the case where there is evidence which supports that theory. *Grable v. State,* Wyo., 649 P.2d 663 (1982); and *Goodman v. State,* Wyo., 573 P.2d 400 (1977). Here the trial court did give an instruction on the defense of self-defense at the conclusion of the trial. As we noted in *Garcia v. State,* supra, our reading of the record leaves us skeptical with respect to the validity of the defense of self-defense under these circumstances, but the testimony of the appellant that he acted in self-defense is sufficient to justify the instruction. We have been afforded, however, no reason to speculate that the jurors violated their oaths and in some way refused to follow the court's instruction on the theory of self-defense. In this instance the contrary appears. If anything the verdict of the jurors demonstrates sympathy with respect to the appellant's claim of justification. We perceive no prejudice to the appellant arising out of the inhibition of voir dire examination.

In a corollary argument, however, the appellant argues that his right to make intelligent use of his peremptory challenges was inhibited. Although the Supreme Court of the United States has recognized that there is no constitutional right of an accused to peremptory challenges with respect to potential jurors in criminal cases, *Stilson v. United States,* 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154 (1919), if peremptory challenges are made available they become "one of the most important of the rights secured to the accused." *Pointer v. United States,* 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894). Accord, *Swain v. State of Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); and *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136,

36 L.Ed. 1011 (1892). As the Court said in *Swain v. State of Alabama,* supra, 380 U.S. at 219–220, 85 S.Ct. at 835, "[The availability of peremptory challenges] allows counsel to ascertain the possibility of bias through probing questions on the voir dire and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause." The Court also noted in *Swain v. State of Alabama,* supra, that the peremptory challenge is by its very nature one which is exercised without a stated reason, *without inquiry* and without being subject to the control of the court. Even though the availability of a peremptory challenge facilitates the process of the selection of an impartial jury by encouraging full, free, and comprehensive voir dire examination of prospective jurors with regard to bias, prejudice or any other grounds for challenge for cause while at the same time affording the party protection from antagonism that may be developed by such voir dire, still the purpose of the voir dire is not to explore for a reason for the exercise of the peremptory challenge. The Supreme Court of the United States quite recently has held that the failure of a juror to answer a question on voir dire would justify a new trial only if a correct answer would have furnished a basis for a challenge for cause. *McDonough Power Equipment, Inc. v. Greenwood,* —— U.S. ——, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). If no prejudicial error can be found in such an instance surely there could be no prejudicial error attaching to a ruling by the trial court that a question which does not pertain to a ground for a challenge for cause cannot be asked.

█ Furthermore, the appellant has not made any showing by brief or argument with respect to prejudice arising out of any inhibition of his exercise of peremptory challenges. The record is silent as to whether or in what manner the appellant exercised his peremptory challenges. His argument is not that he was denied his right with respect to the use of the peremptory challenges, but simply that he could in some way have better utilized his challenges if the trial court had not exercised its discretion with respect to the conduct of voir dire in the manner in which it did. There is no error to be found in this claim. The appellant was entitled to a fair and impartial jury, not one which he perceived to be sympathetic. In this regard we note that the following matter does appear in the record on appeal:

"THE COURT: Are the parties satisfied that a jury of twelve, plus two alternates, has been drawn and qualified in this matter? Mr. Carroll?

"MR. CARROLL: The State is satisfied, Your Honor.

"THE COURT: And, Mr. Barrett?

"MR. BARRETT: Defense is satisfied, Your Honor." [3]

█ In summary, there does not appear any abuse of discretion by the trial court with respect to the conduct of the voir dire examination of the jury panel in this instance. We appreciate the desire of counsel to try their case at the time of voir dire examination, but if the trial court, in the exercise of its discretion, does not permit that the parties have no legal basis for complaint. We might note in passing the dismay sometimes expressed with respect to the lengthy process of jury selection in some courts around this country. See *People v. Crowe,* 8 Cal.3d 815, 106 Cal.Rptr. 369, 506 P.2d 193 (1973). Obviously that is what occurs if counsel are given free rein to present imaginative theories, contentions, and potential evidence in the course of the examination of the jurors for challenge for cause. We conclude that the policy represented by Rule 17, Uniform Rules for the District Courts, and the practice in our trial courts, as exemplified here, is sound. The parties are furnished the opportunity to make proper inquiry, but

**3.** There is precedent for the proposition that any errors such as those claimed by the appellant relating to voir dire examination are waived by his acceptance of the jury. *State v. Cross,* 72 Conn. 722, 46 A. 148 (1900); *People v. Rose,* 268 Mich. 529, 256 N.W. 536 (1934).

they are foreclosed from trying their cases at the time of voir dire.

## THE EXPERT PSYCHIATRIC WITNESS

The appellant's second issue involves his attempt to elicit testimony from a forensic psychiatrist by whom the appellant had been examined at the request of defense counsel. Two aspects of the ruling of the court are complained of by the appellant. The first is the ruling by the district court which sustained an objection by the State to a question of the forensic psychiatrist about what the appellant had told the psychiatrist about his family home life and his experiences in growing up. The second aspect involves questions upon which the district court did not rule which deal with the pertinency of expert testimony as it might assist the jury in assessing the reasonableness of the appellant's conclusion that his life was threatened or that he was in danger of serious bodily injury in connection with the killing of his father.

As to the first aspect of this contention by the appellant the question asked was:

"Q What did he tell you about his family home life and his growing up experiences?"

The appellant's position is that such testimony is admissible under the exception to the hearsay rule contained in Rule 803(4), W.R.E., which provides:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 \* \* \* \* \* \*

"(4) *Statements for purposes of medical diagnosis or treatment.*—Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

We recently have dealt with this particular exception to the hearsay rule in *Goldade v. State*, Wyo., 674 P.2d 721 (1983). We there held that a physician who was examining a child victim of abuse could testify with respect to statements made by the child victim. We held that this was permissible because the doctor was engaged in making a diagnosis of the "battered-child syndrome." We had no occasion to consider the testimony of the physician as it might apply to a case of self-defense.

The record discloses that the State's objection was that the information sought to be elicited by this question was not relevant. There followed lengthy argument between counsel for the appellant and counsel for the State which encompassed matters reaching the second aspect of the appellant's position with respect to the testimony of the forensic psychiatrist. Ultimately the trial court articulated its ruling in this way:

"Well, the court isn't convinced that what was stated to Dr. McDonald by the defendant here clearly falls into the hearsay exception.

"And I state that for the reasons that I have previously expressed to counsel.

"It would appear that the primary reason that the defendant consulted Dr. McDonald was to later provide Dr. McDonald's testimony in court, as being presented here today.

"I haven't been presented any evidence of any court's acceptance of the science of the battered child, what can be predicted from the battered child. I don't believe that Dr. McDonald's testimony is being offered as an admission against interest, although there may be an admission against interest contained in some of the things told to him or alleged to have been told to him by the defendant.

"And Mr. Carroll can't cross-examine the defendant as to what he has told the doctor, so I don't see where cross-examination is the great protector in this instance.

"I believe that the testimony and the opinions and conclusions of Dr. McDonald, as suggested by counsel, would invade the province of the jury.

"The jury, I believe, is to determine the reasonableness of any fears, and they should determine that by evidence of a person who testifies as to the facts, the situation, and draw their conclusions.

"The court is sustaining the objections of the state to this testimony."

These comments sufficiently distinguish *Goldade v. State*, supra.

 The rule which this court has applied with respect to rulings as to admissibility of evidence is articulated in *Taylor v. State*, Wyo., 642 P.2d 1294, 1295 (1982), as follows:

"It has been held generally that the admission of evidence is within the sound discretion of the trial court and absent a clear abuse of discretion will not be disturbed. It is also the general rule that the foundation, relevance, competency, materiality, and remoteness are within the sound discretion of the trial court and will be upheld on appeal absent a clear abuse of discretion." (Footnotes omitted.)

The burden of establishing the clear abuse of discretion must be assumed by the party who attacks the ruling of the trial court. *Buhrle v. State*, supra; *Nimmo v. State*, Wyo., 603 P.2d 386 (1979). That party must establish that the ruling of the trial court was erroneous and that it did affect substantial rights of the party. The trial court in the exercise of its discretion can exclude even relevant evidence when there are countervailing considerations such as "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Rule 403, W.R.E.

 The definition that this court has espoused of an abuse of discretion is found in *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980), where it is stated as follows:

"'* * * An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. * * *'"

When an abuse of discretion is relied upon we should examine the ruling in light of the situation before the trial court at the time it ruled. We have said:

"In the context of evidentiary rulings at trial, this court has long adhered to the doctrine that a sufficient offer of proof is necessary so that this court may be adequately apprised of the nature of the excluded testimony. *Padilla v. State*, Wyo., 601 P.2d 189 (1979); *Elliott v. State*, Wyo., 600 P.2d 1044 (1979); *Montez v. State*, Wyo., 573 P.2d 34 (1977); *Pack v. State*, Wyo., 571 P.2d 241 (1977); *State v. Goettina*, supra [61 Wyo. 420, 158 P.2d 865 (1945)]; *State v. Rouse*, [58] Wyo. 468, 134 P.2d 1116 (1943); *Jenkins v. State*, 22 Wyo. 34, 134 P. 260, reh. denied [22 Wyo. 34], 135 P. 749 (1913); and *McGinness v. State*, 4 Wyo. 115, 31 P. 978, reh. denied [4 Wyo. 115], 53 P. 492 (1893). The dual purpose of this requirement is to enable the trial court to be fully advised in the exercise of its discretion regarding the admission of evidence, and to enable the reviewing court to determine if prejudicial error resulted from the exclusion of the proffered testimony." *Garcia v. State*, Wyo., 667 P.2d 1148, 1155 (1983).

In the course of the argument with respect to this objection various statements were made on behalf of the appellant which can be considered as at least in the nature of an offer of proof. We will say more about those comments later, but at this point it is sufficient to recognize that the suggestion made to the court was that the testimony of the forensic psychiatrist was leading up to a showing of the reasonableness of the appellant's conduct and actions on the night of his father's death. The appellant, however, did not demonstrate in the offer of proof how this information would relate to a claim of self-defense.

It also is significant that at the time the testimony of the forensic psychiatrist was offered there had been no showing made in the record that the appellant was acting in self-defense. See *State v. Velsir*, 61 Wyo. 476, 159 P.2d 371, 161 A.L.R. 220 (1945);

and *Mortimore v. State*, 24 Wyo. 452, 161 P. 766 (1916). The point is made by comparing the factual circumstances in this case with those in *Mortimore v. State*, supra. In *Mortimore v. State*, supra, the defendant was convicted of manslaughter for the shooting death of his father. The justification which served as a defense was that the defendant had acted in defense of a brother who was being violently assaulted by the father. The point raised on appeal was the exclusion by the trial court of proffered evidence relating to specific acts of violence by the deceased upon the defendant and other members of the family and threats made by the deceased in the presence of the defendant at the time of the shooting. In that case this court said:

"We are convinced that the better reasoning sustained the rule that such evidence is admissible, under a claim of self-defense, where there is evidence tending to support it, when the facts might have affected defendant's apprehensions. There was in this case, not merely an impending assault by the deceased upon the defendant's brother, but an actual and violent assault by one of greater strength and with the advantage of position, immediately following a threat, seemingly made in anger, which, if carried out, might result, not only in great bodily harm to the one assailed, but the taking of his life. That he was in danger of some bodily harm was apparent. The question then was the probability of the assault continuing and the extent of the danger; and we think it clear that the defendant's apprehension as to that matter might reasonably have been affected by his knowledge of the previous assaults upon himself, his mother, and sister. We are of the opinion, therefore, that the evidence to show such acts was admissible, and that its exclusion was error and prejudicial; and the prejudice was enhanced by the conflict in the evidence respecting the general reputation of the deceased. * * * * " 161 P. at 774.

Analytically, based upon what was said by this court in *Mortimore v. State*, it might be said that a history of child abuse comes within the usual rule permitting evidence of prior acts of violence on the part of the deceased. The Supreme Court of Ohio put the matter in perspective in *State v. Thomas*, supra, when it said at 66 Ohio St.2d 520, 423 N.E.2d 137:

"In a trial such as this one, where the evidence raises an issue of self-defense, the only admissible evidence pertaining to that defense is evidence which establishes that defendant had a bona-fide belief she was in imminent danger of death or great bodily harm, and that the only means of escape from such danger was through the use of deadly force. * * * " (Footnote omitted.)

If this purpose is recognized with respect to the testimony sought to be elicited from the forensic psychiatrist the propriety of the trial court's refusal to invoke the hearsay exception relied upon must be recognized.

 At the time of the trial court's rulings the facts manifested by the record in this case contrast significantly with those in *Mortimore v. State*, supra. This record contained no evidence that the appellant was under either actual or threatened assault by his father at the time of the shooting. Reliance upon the justification of self-defense requires a showing of an actual or threatened imminent attack by the deceased. See *Garcia v. State*, supra; *State v. Velsir*, supra; and the cases cited therein. In a case involving a defense of self-defense by an abused wife the Supreme Court of Illinois, in addressing facts similar to these, said:

"* * * It is true that, under the law of self-defense, one who is deliberately assaulted in a manner to make him reasonably apprehensive of death or great bodily harm has the right to kill his assailant, if it reasonably appears to him that such action is necessary to save himself from death or great bodily harm. (*People v. Motuzas*, 352 Ill. 340, 185 N.E. 614; see *People v. Strader*, 23 Ill.2d 13, 177 N.E.2d 126.) However, the right of self-defense does not imply the right of at-

tack in the first instance or permit action done in retaliation or revenge. (*People v. Gibbs*, 349 Ill. 83, 181 N.E. 628; *People v. Andrews*, 327 Ill. 162, 158 N.E. 462.) While there is much testimony indicating that defendant had frequently been physically mistreated by her husband, that is not the question here. The question is, rather, whether the evidence shows that, at this particular instant, her husband had made an unprovoked assault upon her which put her in reasonable fear of imminent death or great bodily harm which could be avoided only by stabbing him. * * * " *People v. Dillon*, 24 Ill.2d 122, 180 N.E.2d 503, 504 (1962).

Absent a showing of the circumstances involving an actual or threatened assault by the deceased upon the appellant, the reasonableness of appellant's conduct at the time was not an issue in the case, and the trial court, at the time it made its ruling, properly excluded the hearsay testimony sought to be elicited from the forensic psychiatrist.

The second aspect of the appellant's position is far broader than the record will support. As noted in connection with the argument surrounding the objection of the State with respect to the specific question quoted above, counsel for the appellant touched upon the overall purpose of the testimony of the forensic psychiatrist. It is clear that the psychiatrist had interviewed the appellant on seven separate occasions for a total of twelve hours in preparation for the trial. He also had visited with other people about the appellant. At the trial appellant's counsel advised the court that the psychiatrist would express an opinion as to the appellant's mental or emotional condition, and the assertion was made that the appellant had a right to establish the facts which formed the basis for that opinion. The counter-argument of the State was premised upon *Smith v. State*, Wyo., 564 P.2d 1194 (1977), and was to the effect that such an opinion was not admissible in the absence of a plea of not guilty by reason of mental illness or deficiency. See § 7–11–304(a), W.S.1977. Reference

was made to the psychiatrist's testimony at the time of the hearing on the appellant's motion to transfer the case to the juvenile court. On that occasion the psychiatrist had testified that in his opinion the appellant was a battered youth suffering from a mental disorder which was not defined or recognized under the accepted standards of diagnosis of mental and personality disorders in his field of expertise. At that hearing he related the history of the appellant's abuse at the hands of his father as the appellant had given it to him. He said that the appellant was very much afraid of his father.

In further support of the admissibility of testimony from the forensic psychiatrist counsel advised the court:

"We would submit that Dr. McDonald's testimony would go to the fact that the defendant Richard Jahnke was brutalized by his father in May of 1982, that he was brutalized by his father on November 16th of 1982, that he had been brutalized by his father for many years in the past.

\*　　\*　　\*　　\*　　\*　　\*

"We would also submit to the court that if the court feels that it is necessary that Dr. McDonald should not be allowed to render any opinion of or diagnosis, the defense could abide by that statement. "However, we would make an offer of proof that, if allowed to testify, he would testify that he believes that Richie Jahnke is emotionally impaired, that he believes that Richie Jahnke is a battered child.

"We believe that those issues, as to his diagnosis and opinions, are separate and distinct as to his testimony and statements concerning the other factors that Richie Jahnke told him."

In response to a concern of the trial court with respect to the sufficiency of the state of scientific knowledge regarding the "battered-child syndrome," counsel for the appellant asked the trial judge if they might correct some of the problems connected with the psychiatrist's testimony if they provided evidence or testimony with

regard to the state of scientific knowledge as it pertained to the effect of the battered-child syndrome. The following dialogue then occurred:

"THE COURT: If you want to make—If you want to attempt that, the court will always listen to you and hear you.

"MR. BARRETT: Is the court, then, ruling that it is acceptable for us to present evidence out of order first on the matter of the battering and the effect of that type of battering upon Mr. Jahnke prior to submitting evidence of state of mind and fear on November 16th of 1982?

"THE COURT: Well, the court is saying that it will rule on the objections as they are presented."

 As noted, the appellant invokes the theory discussed in *Buhrle v. State*, supra, and the other cases involving the "battered-wife syndrome." We do not perceive how the offer of proof presented by the appellant was sufficient to satisfy the criteria for admissibility of expert testimony quoted in *Buhrle v. State*, supra, 627 P.2d 1376, from *Dyas v. United States*, 376 A.2d 827, 832 (D.C.C.A.1977), cert. denied 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977). We particularly note that there was no offer to prove that the state of the pertinent art or scientific knowledge permitted a reasonable opinion to be asserted by the expert, and the suggestion of his earlier testimony on the occasion of the motion hearing is to the contrary.

 Be that as it may, the effort to produce testimony from the forensic psychiatrist was abandoned by the appellant. The argument concerning the objection occurred at the close of trial on one day. Despite the court's statement that it would be willing to listen to further matter in this area, the psychiatrist never was recalled to the stand. We cannot speculate as to what may have led to that decision by the appellant. We do know that the following day the appellant initially agreed to plead guilty to a charge of voluntary manslaughter in exchange for a reduction of the charge of first degree murder to manslaughter and dismissal of the conspiracy charge. Later in the day his counsel advised the court that the appellant did not wish to do that, and a further recess was granted by the court. Ultimately counsel for the appellant informed the court that the appellant desired to continue with the trial. The forensic psychiatrist was not released by the court, and the record discloses that he was in Cheyenne during the morning of this day of the trial. When the trial resumed in the afternoon, however, a new witness was called. Under these circumstances the record does not support any claim of error with respect to the alleged refusal of the trial court to permit expert testimony designed to justify the reasonableness of the actions of the appellant assuming that a self-defense context were developed.

## ABUSE OF DISCRETION IN SENTENCING

The only other issue raised by the appellant is his contention that the trial court impermissibly abused its discretion in imposing a sentence of not less than five nor more than fifteen years in the state penitentiary. The rule of law which this court has articulated in a number of earlier holdings is that if a sentence is within the statutory limits it will not be disturbed upon appeal absent a clear abuse of discretion. *Eaton v. State*, Wyo., 660 P.2d 803 (1983); *Taylor v. State*, Wyo., 658 P.2d 1297 (1983); *Daniel v. State*, Wyo., 644 P.2d 172 (1982); *Cyrus v. State*, Wyo., 639 P.2d 900 (1982); *Scheikofsky v. State*, Wyo., 636 P.2d 1107 (1981); *Jones v. State*, Wyo., 602 P.2d 378 (1979); *Smith v. State*, Wyo., 564 P.2d 1194 (1977); *Daellenbach v. State*, Wyo., 562 P.2d 679 (1977); *Cavanagh v. State*, Wyo., 505 P.2d 311 (1973); *Bird v. State*, 36 Wyo. 532, 257 P. 2 (1927); and *State v. Sorrentino*, 36 Wyo. 111, 253 P. 14 (1927).

In his argument the appellant recognizes the historic rule of this court pursuant to which sentencing is left to the sound exercise of discretion by the trial court. He urges, however, that in the absence of standards under which the fairness of a

sentence can be measured there is no possibility of demonstrating either an abuse of discretion, or circumstances which manifest unfairness and injustice, or conduct which offends the public sense of fair play. *Scheikofsky v. State*, supra. The appellant urges that there be adopted for the State of Wyoming the objectives and standards for review set forth by the Supreme Court of Alaska in *State v. Chaney*, Alaska, 477 P.2d 441 (1970) [4] and applied in *Ripley v. State*, Alaska, 590 P.2d 48 (1979). The position of the appellant is that the application of these standards and objectives in this case must lead to a conclusion that there was an abuse of the trial court's discretion in sentencing.

At the time that sentence was imposed the record discloses that the trial judge had read and considered a presentence report prepared by the Department of Probation and Parole as well as a report prepared by the National Center on Institutions and Alternatives. He had considered the options available to him in sentencing and, in addition, he had reviewed communications he had received from members of the public concerning the sentence. The trial court was fully aware of all the circumstances surrounding this crime and the character of the appellant at the time sentence was imposed. The trial court found that the verdict entered by the jury properly reflected their compassion for the appellant and also their rejection of his theory of self-defense. The court expounded on the various factors it had considered in reaching its sentence and concluded that "for the purposes of recognizing and supporting society's law, for its protection, for discouraging other persons from committing acts similar to yours, and to satisfy the need to trust in public justice as opposed to private justice,

the court has decided against probation." The court then entered its sentence.

■ This sentence is within the statutory limits, and in light of the record of the sentencing proceedings we are unable to conclude that the sentence imposed by the trial court amounted to an error of law under the circumstances. We perceive no abuse of discretion and agree with and affirm the sentence imposed by the trial court. We believe that the same result would be reached if this case were before the Supreme Court of Alaska.

Since there is no error in these proceedings such as that claimed by the appellant, the Judgment and Sentence of the district court is affirmed.

BROWN, Justice, specially concurring.

I totally agree with the majority's excellent opinion. I only wish to emphasize that at trial appellant received every consideration he was entitled to, and more.

At the outset I confess to a philosophical bias against people who take the law into their own hands and execute their supposed tormentors. I am particularly opposed to patricide. After considering the news, particularly letters to the editor, I conclude that I must represent a view contrary to that of the public.

Appellant is handsome, personable, intelligent and ready of tongue. He is an all American boy, except that he has a predilection toward patricide. Appellant and his incredible story caught the imagination of the media and public.

Richard thought about killing his father many times before November 16. On the 16th he made elaborate plans for the execution. He lay in wait for an hour and one half, then blew his ROTC whistle to freeze

---

**4.** In *State v. Chaney*, supra, 477 P.2d at 443, the Alaska court articulated the following objectives of sentencing review:

"(i) To correct the sentence which is excessive in length, having regard to the nature of the offense, the character of the offender, and the protection of the public interest;

"(ii) To facilitate the rehabilitation of the offender by affording him an opportunity to

682 P.2d—23

assert grievances he may have regarding his sentence;

"(iii) To promote respect for law by correcting abuses of the sentencing power and by increasing the fairness of the sentencing process; and

"(iv) To promote the development and application of criteria for sentencing which are both rational and just."

his victim. He fired repeatedly, propelling lead into his father's body. His first comment after the slaying was that he did it for revenge. This is a textbook case of first-degree murder.

The jury convicted appellant of killing his father voluntarily upon a sudden heat of passion. If lying in wait for one and one-half hours is a "sudden heat of passion," then appellant must have been frozen in time. This must have been the longest "sudden" in history.

In his defense appellant employed the oldest, most common and most successful tactic in homicide cases. He put the deceased on trial. His strategy was largely successful as he was convicted of a lesser offense when the uncontradicted evidence and appellant's admission pointed only to murder.

Evidence produced by appellant characterized the deceased father as a cruel, sadistic and abusive man. Experience, common sense and the conduct of Mrs. Jahnke indicated to me that the testimony in support of this characterization was greatly exaggerated. There was no one at trial to speak for the deceased. All defense witnesses were at liberty to say anything they wanted about the deceased, knowing that they could not be contradicted. Defense witnesses had a motive to make the deceased look like a bad man; they wanted to make the jury believe that appellant's father deserved to be executed. By no stretch of the imagination was this a case of self-defense. Arming and barricading himself and lying in wait for one and one-half hours for his father's return is not self-defense under the law.

The trial judge was eminently fair with appellant and resolved any doubt in his favor. Appellant was not entitled to an instruction on self-defense, nor was he entitled to an instruction on the lesser included offense of manslaughter because there was no evidence justifying either instruction. However, the judge being abundantly cautious gave these instructions.

Mrs. Jahnke's testimony at trial is suspect. On the one hand she describes four-teen years of ruthless beatings. She was afraid that the deceased was going to kill her son. On the other hand, a few hours before the slaying, she had a minor dispute with Richard and told her husband that her son had sassed her, knowing that her son would be punished. After informing on Richard, she went out for the evening with her husband to celebrate the tender moment they first met. Before going out Mrs. Jahnke threw her arms around her husband, kissed and hugged him, told him she loved him and that he was good to her. Yet, this was the man she feared would kill her child.

Richard's avowed motives for gunning down his father have changed during this ordeal depending upon his forum. While he was in an excited state he told his girlfriend's father that he did it for revenge. While still exhilarated he told Officer Hildago that he killed for past things. Then his expressed reason briefly changed and he claimed self-defense at the trial. Richard now says he did it for his mother and sister. He said at a later trial he killed his father to "stop him from further abuse of his family."

Many in our society are fascinated by violence. We make folk heroes out of our criminals. Ballads and odes are written about murders. The more bizarre or unusual the murder, the greater the proliferation of songs, poems and books. The public's thirst for this sort of literature will not be stilled. If a person wants to become famous and even wealthy, he just needs to commit a grotesque crime.

John Herbert Dillinger and Alphonse Capone will live in our history for more than one hundred years. Good men, contemporaries of Dillinger and Capone are already forgotten. "The evil that men do lives after them; the good is oft interred with their bones." Wm. Shakespeare, Julius Caesar (The Tragedy of), Act 3, Scene 2.

Perhaps Richard Jahnke was entitled to compassion because of his age. The jury meted out that compassion when they found him guilty of manslaughter, despite

the fact that the evidence pointed to murder. The judge's sentence evidences further compassion. He could have sentenced Richard to not less than nineteen years, eleven months and twenty-nine days. The judge and jury deserve to be commended, rather than harangued by the public. They demonstrated intelligence, good judgment and compassion.

ROSE, Justice, dissenting, with whom CARDINE, Justice, joins.

I will join in Justice Cardine's dissent, and herewith offer a separate dissenting opinion.

### An Introduction To Dissent

This case concerns itself with what happens—or can happen—and did happen when a cruel, ill-tempered, insensitive man roams, gun in hand, through his years of family life as a battering bully—a bully who, since his two children were babies, beat both of them and his wife regularly and unmercifully. Particularly, this appeal has to do with a 16-year-old boy who could stand his father's abuse no longer—who could not find solace or friendship in the public services which had been established for the purpose of providing aid, comfort and advice to abused family members—and who had no place to go or friends to help either him or his sister for whose protection he felt responsible and so—in fear and fright, and with fragmented emotion, Richard Jahnke shot and killed his father one night in November of 1982. In these courts, Richard pleads self-defense and, since the jury was given a self-defense instruction, it must be conceded that the trial judge recognized this as a viable defense theory under the evidence adduced at trial.

In this dissenting opinion, besides agreeing with Justice Cardine that voir dire was erroneously limited, I find error in the majority opinion's conclusion that the trial court properly excluded the proffered expert psychiatric witness' testimony from the jury's consideration.

Appellant's offer of proof indicated Dr. McDonald, a forensic psychiatrist, would testify that:

1. The doctor had diagnosed Richard Jahnke as a battered child, based on interviews with Jahnke and other information.

2. Battered children behave differently from other children, and perceive things differently from other children.

3. Because he was a battered child, Richard Jahnke reasonably believed himself to be in immediate danger on the night he shot his father, and perceived himself as acting in self-defense.

When the evidence was in, the court gave the jury the following self-defense instruction—an instruction with respect to which I take no exception:

### "INSTRUCTION NO. 8

"If the defendant had *reasonable grounds to believe and actually did believe* that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, he had the right to use deadly force in order to defend himself. 'Deadly force' means force which is likely to cause death or serious bodily harm.

"*The circumstances under which he acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable belief* that the other person was about to kill him or do him serious bodily harm. *The danger must have been apparent, present and imminent or must have appeared to be so under the circumstances.*

"*If the defendant believed that he was in imminent danger of death or serious bodily harm, and that deadly force was necessary to repel such danger, and if a reasonable person in a similar situation seeing and knowing the same facts would be justified in believing himself in similar danger, he would be justified in using deadly force in self-defense. He would be justified even though the*

*appearance of danger later proved to be false and there was actually neither purpose on the part of the other person to kill him or do him serious bodily harm nor imminent danger that it would be done, nor actual necessity that deadly force be used in self-defense. If the person so confronted acts in self-defense upon such appearances of danger from honest belief, his right of self-defense is the same whether the danger is real or merely apparent.* On the other hand, a bare fear of death or serious bodily harm is not sufficient to justify the killing of another person." [1] (Emphasis added.)

It is my position that, since the issue of self-defense in the unusual behavioral circumstances of this case is a subject which is cloaked in the abstract mysteries of professional knowledge, the jury, deprived of an expert's explanation of how battered people perceive and respond to the imminence of danger, could not be expected to and did not understand and quantify the impact and residuals of the years and years of battering which had been the lifelong fate of Richard Jahnke. The jury could, therefore, not know—or be expected to know—whether his acts, at the time and

place in question here, were those of the reasonable person similarly situated for whom the law of self-defense provides comfort.[2]

Denied the explanatory assistance of a qualified expert witness, it is as though Richard Jahnke had not been permitted to defend himself at all. Since the necessity to defend oneself or others from perceived imminent danger is a subjective consideration for the defendant [3] but one which is an objective concern of the jury,[4] how could this young boy structure an understandable defense when—even though the record discloses that since age two he had been bullied, battered, frightened and emotionally traumatized—he was, nevertheless, denied the opportunity to have explained to his jury how abused people reasonably handle their fears and anxieties—what their apprehensions are—how, in the dark moments of their aloneness, they perceive the imminence of danger—and how, in response, they undertake to assert their right of self-defense?

It is my conception that Richard Jahnke properly came to the courts of Wyoming asking—not that he be judged as one who, at the time and place in question, was

---

**1.** This instruction is identical to the Wyoming Pattern Jury Instruction on self-defense, which pattern instruction carries this "Comment":

"The defendant must believe that the threatening danger is imminent, but the danger does not have to be imminent in fact. *Parker v. State,* 24 Wyo. 491, 161 P. 552, 555 (1916). "To claim self-defense, the defendant's belief as to the necessity of defending himself must have been based on reasonable grounds. A subjective belief does not by itself entitle defendant to use the justification of self-defense. *Loy v. State,* 26 Wyo. 381, 185 P. 796, 799 (1919). "When the evidence presents the theory of apparent danger, 'an instruction which limits the right of self-defense to actual or real danger alone is erroneous.' *State v. Radon,* 45 Wyo. 383, 19 P.2d 177, 182 (1933)."

**2.** See infra *Ibn-Tamas v. United States,* D.C.App., 407 A.2d 626 (1979) for a "beyond the ken of the average layman" discussion.

**3.** In *Parker v. State,* 24 Wyo. 491, 161 P. 552, 555 (1916), we said:

" * * * The assault must be of such character as to create *in the mind of the defendant* a reasonable belief that the danger is imminent and that it is necessary to take the life of his assailant in order to protect himself from death or great bodily harm; but *it is not necessary that the danger be in fact imminent. If the circumstances are such as to create in the mind of a reasonable man an honest belief that he is then in such imminent danger,* and, so believing, he kills his assailant, he is excusable." (Emphasis added.)

The *Parker* rule reflects the sense of the given self-defense instruction in this case, supra. It is also consistent with *State v. Radon,* 45 Wyo. 383, 19 P.2d 177, 182 (1933), which is discussed in detail infra.

**4.** In *Loy v. State,* 26 Wyo. 381, 390, 185 P. 796, 799 (1919), this court said:

" * * * Defendant must not only believe he is in danger, but the circumstances must be such as to afford reasonable grounds for the belief."

*insanely unreasonable*[5]—but that his 14 years of beatings and uncivilized emotional abuse be explained by a qualified expert in order that judgment be passed on the question which asks whether or not his behavior was *sanely reasonable.* One might wonder why—since our courts admit expert testimony with commendable regularity upon the issue of sanity when that is the ultimate fact—and the plea is insanity—it is not acceptable that a psychiatrist testify about whether behavior such as that with which this case is concerned and which is unlike that which lay jurors would understand to be the expected, is, nevertheless, sanely typical of the behavior of a reasonable person acting in the same or similar circumstances. Richard was not, however, permitted to have the impact of 14 years of abuse upon his alleged self-defensive behavior explained to the jury through the testimony of a psychiatrist even though this is the only way the fallout from brutality can be communicated.

Denied this opportunity, the appellant was forced to submit his case to the jury with what consequently presents itself as a ridiculous, unbelievable, outrageous defense. Without medical input, what possible sense could it make to a lay juror or any other nonprofessional person for the citizen accused to urge self-defense where the evidence is that, even though the recipient of untold battering and brutalizing by the victim, the defendant nevertheless contemplated the possibility of the use of deadly force as he lay in wait, gun in hand, for his father's return? How could any jury

be receptive to such a defense on an informed basis if its members are not to be permitted to hear from those who understand how brutalized people—otherwise "reasonable" in all respects—entertain what, for them, is a belief that they are in imminent danger from which there is no escape and how they, with their embattled psyche, responsively behave?

*The Reasonableness of Self-Defense*

As can be seen from the instruction which the court gave the jury, supra, and contrary to the holding of the majority,[6] the law requires that Richard Jahnke must have acted as a "reasonably prudent person, similarly situated" would act—before self-defense is available. It is not, however, necessary that the perceived danger must in fact be present and imminent—it need only to "have appeared to be so under the circumstances." In this case, therefore, the appearance of imminent danger must have been present in the mind of the defendant, not the trial court or this court.

I concede that, in the ordinary self-defense fact situation it is not necessary to rely upon expert testimony to explain the perception of the accused at the moment of crisis when he or she resorts to the use of deadly force. Particularly is this true where the victim's past acts of violence which are known to the defendant are made available to the jury's consideration.[7] This is so because, given the surrounding facts and the victim's past acts of violence of which the accused was aware, it is usually within the ken of the lay juror that there

---

5. As will be seen infra, the prosecution insisted that the defendant's offer of psychiatric testimony was irrelevant since there had been no plea of insanity or diminished capacity—which latter defense, it was argued, is not acknowledged in Wyoming. The judge shared the prosecutor's misconception because one of the grounds for refusal was that the court believed the purpose of the psychiatric testimony was an effort to establish "some sort of mental deficiency."

6. Contrary to the historic self-defense rule of this and all other courts of which I have knowledge, the majority hold that the defendant must be under "an actual or threatened assault" before the reasonableness of his conduct will raise

a self-defense issue. See discussion of this issue supra.

In *Parker v. State,* supra n. 3, this court held it to be error for the trial judge to have given a self-defense instruction which did not take into account the fact that the imminence of the danger must only exist in the mind of the defendant and we held that *it is not the law that the danger must in fact be imminent.* See also *State v. Radon,* supra n. 3; *Loy v. State,* supra n. 4.

7. In a second-degree murder case, we held it error for the court to refuse jury consideration of past acts of the victim's violence which were known to the defendant. *Mortimore v. State,* 24 Wyo. 452, 161 P. 766 (1916), discussed infra.

either was or was not an assault in response to which the defendant was either justified or not justified in believing himself to be in imminent danger and that he either did or did not behave as a reasonable person similarly situated when he resorted to the use of deadly force. In these circumstances, the lay juror can call upon his or her life's experiences to structure the reasonableness test. In other words, when the jury is allowed to be made aware of what the defendant knew about the assailant's propensity for violence, and the evidence is that the defendant's back was against the wall as he looked down the barrel of a gun, there is, of course, no need to call up expert testimony to explain whether the resort to deadly force was or was not the behavior of a reasonable person. In this situation, the lay juror is able to place him or herself at the scene and in the shoes of the accused and decide whether or not it was reasonable for the defendant to believe that he would be killed or receive serious bodily harm unless he resorted to the use of deadly force. In these situations, the jury is capable of judging imminence of danger and reasonableness of response without the help of anyone. It is in these circumstances that courts like to say that juries are composed of reasonable people who know how reasonable people behave—and, of course, this is so.

Since, however, we are involved with a battering and brutalizing factor in this case which the defense urges is causally connected with the reasonableness of Richard Jahnke's conduct, the appellant contends the jury was confronted with an unusual self-defense fact situation characterized by a psychiatric overlay. This being so, the question becomes this: Are the life's experiences of the lay juror adequate to enable him or her to make an informed reasonableness decision in this case, or do the facts describe the kind of an area where the lay juror requires assistance from an expert witness? In my judgment, it was so necessary that the jury have the help of an expert that it was not even a discretionary

decision with the trial court. Especially is this true in this case when the court's erroneous grounds for rejecting the offer of proof are taken into account (discussion infra). Therefore, it is my view that it was error not to make available the expert testimony in circumstances such as those with which we are concerned here.

In *Hawthorne v. State*, Fla.App., 408 So.2d 801, 806 (1982), the court said:

"We agree with the view expressed by the Georgia Supreme Court in *Smith v. State* [247 Ga. 612, 277 S.E.2d 678 (1981)] insofar as it concluded that jurors would not ordinarily understand 'why a person suffering from battered-woman's syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself ....' 277 S.E.2d at 683." [8]

In addition, the exclusion of the proffered expert testimony in the case at bar runs afoul of the announced policy of the courts of this state which allows a qualified expert to testify whenever the specialized knowledge will

"* * * assist the trier of fact to understand the evidence or to determine a fact in issue * * *." Rule 702, W.R.E.

The expert may testify by opinion "or otherwise," and he may base his "opinion or inference" on facts that were known at or before trial. Rule 703, W.R.E. Further, if the facts or data upon which he bases his opinion are those which are reasonably relied upon by experts in the field, they need not be admissible in evidence. Rule 703, W.R.E.

Whether or not the proffered testimony will assist the trier of fact to understand the evidence or determine the fact in issue is to be resolved by a common-sense inquiry which asks whether the untrained layman would be qualified to determine the issue to the best possible degree without enlightenment from those having a specialized understanding of the subject matter. Rule 702, F.R.E., Advisory Committee Note. These rules and explanatory con-

---

**8.** Expert testimony was essential in *Ibn-Tamas* *v. United States,* supra n. 2, discussed infra.

cepts comport with the historical position of this court. In *Long v. Big Horn Construction Company*, 75 Wyo. 276, 295 P.2d 750, 753 (1956), we said:

"The general rule is that witnesses must testify to facts within their knowledge and may not state their opinions, such opinions being deemed irrelevant. There are exceptions to this rule, of course, such as witnesses who possess peculiar skill or knowledge, whose opinions may be received when the facts are such that the court presumptively without such skill or knowledge is likely to prove incapable of forming a correct judgment relative to the matter in hand without the aid of such opinion."

It will, however, be my purpose here to show that the considerations of Rules 702, 703 and 704, W.R.E.[9] (discussed infra) were, by and large, not even taken into account by the court when the expert testimony was offered or, if these rules were considered, the exclusion rulings run contra to the provisions of the aforesaid Wyoming Rules of Evidence.

In contemplating the overall problem which brings on my dissent, it is initially necessary to be aware of at least these following facts:

Richard Jahnke, a sensitive boy who had never been in any sort of trouble in his life, had been beaten regularly and unmercifully by his father since he was two years old. On the night of the homicide he had received a severe beating, and when his father and mother left the house to go to dinner that night, his father said:

"I'm disgusted with the shit you turned out to be. I don't want you to be here when I get back."

The father also said:

"I don't care what I have to do, I'm going to get rid of you. I don't know

how but I'm going to get rid of you, you bastard."

The boy felt he had to protect his sister who was hysterical when the mother and father left for dinner. He did not believe that there was any place or anyone where or to whom they could go for safety. The mother testified that the elder Jahnke always carried a gun, and Richard believed he had one with him that night. Mrs. Jahnke said that when the father said to Richard, "I'm going to get rid of you"—

"He was trying to frighten him and maybe do something else besides just throwing him out of the house."

When Richard was in the garage after having stationed his father's guns around the house for "backup," he reflected upon past confrontations with his father and he was afraid the father would kill him when he returned and found what Richard had done with the guns. Even as he contemplated these things, the father drove the car into the driveway. Richard said he wanted to go and hug him and tell him he loved him, but he remembered when he had done this before, he had received a beating for his efforts. He knew from past experience that when his father "stomped" after him that he was in for a beating. He testified about how his father approached the garage door that night:

"A. Yes. I remember he was stomping. When he stomped down the hall when he was really mad and really prepared to beat someone up, beat on one of us. I remember being a little kid, just sitting in my room. My dad stomping after me to hit me, that I could never stop him. "This time I stopped him."

In the transfer hearing,[10] the doctor was cross-examined to the following effect:

"Q. Did his father—Did he tell you his father made any aggressive acts toward him upon his return to the family home that evening?

---

**9.** Rule 704, W.R.E. calls for the admission of expert opinion testimony where it will assist the trier of fact even though the opinion would embrace the ultimate issue to be decided.

**10.** A "transfer" hearing was held to decide whether or not Richard would be tried in juvenile or adult court. The transcript of this hearing is a part of the record on appeal to this court and was made a part of the defendant's offer of proof.

"A. No, he didn't—He didn't make any aggressive acts other than the way he walked. So far as Richard was concerned, this was the way he walked when a beating was about to take place. He stomped. It reminded him of his father's behavior before beatings. But that was his interpretation, sir.

"Q. Did he tell you that's what provoked him into shooting his father through that closed garage door?

"A. I think that was the thing that, the factor that provoked the shooting."

Since the defendant's behavior is to be judged by the fact-finders according to how they understand the confrontation facts appeared to the self-defense defendant and whether or not his perception and responsive behavior was reasonable—it is of utmost importance that the jury be possessed of all the relevant facts and circumstances of which the defendant was either aware or which otherwise influenced his crisis behavior. This is required in order that the *fact-finders be made qualified to decide* whether the defendant was justified in believing that the danger was present and imminent in a way which would excuse his use of deadly force. It is therefore necessary that the jury, in the *usual* self-defense prosecution, be aware of the victim's propensities for violence of which the defendant had knowledge, and in the *unusual* self-defense case it is equally important that the jury also be informed about the psychological factors which may have impacted upon the behavior of the defendant. The case of *Jahnke v. State* falls into the latter category; the case of *Mortimore v. State*, 24 Wyo. 452, 161 P. 766 (1916), falls into the former category.

In *Mortimore v. State,* supra the 17-year-old defendant was charged with murdering his father in the first degree, to which charge he pled self-defense. The defendant appealed from the judgment entered upon a guilty-of-manslaughter verdict in order that he be relieved from the judge's sentence of not less than two nor more than three years in the state penitentiary.

While the defendant, who shot his father as he appeared to be in the process of choking his older brother, was permitted to introduce a limited amount of testimony pertaining to the violent character of the deceased, much of this kind of evidence was excluded. The evidence of the deceased's past violent acts was offered to show the defendant's knowledge of the character of the deceased for violence and brutality based upon young Mortimore's personal observation. We held that such evidence of specific acts of violence which are known to the defendant and tend to show that the defendant acted in self-defense or, as in the Mortimore case, in defense of another, was admissible, 1 Wharton, Criminal Evidence (10th Ed.), § 63A, and that the trial court's exclusion of this evidence was reversible error.

In *Mortimore* we said that the past specific acts of violence of the deceased should be admitted to explain the defendant's motive and what he might reasonably have apprehended as the danger.[11] We referred to *Sneed v. Territory*, 16 Okl. 641, 86 P. 70, 8 Ann.Case 354 (1906), where the Oklahoma court held this kind of testimony to be admissible in that it showed knowledge in the defendant of the violent temper of the deceased—and his liability to attack without cause. This we said was important—from the standpoint of the accused—in determining the danger apprehended by him

"'* * * and from which the defendant might estimate the conduct of the deceased, the character of the attack made upon him and what one might expect from his assailant as well as that which he might at the moment deem necessary to guard himself against.'" 161 P. at 773.

We quoted from *Boyle v. State*, 97 Ind. 322 (1884), where the Indiana Supreme Court said that whoever is forced to rely

---

**11.** This is the underlying reason for the offer of the psychiatric battered-person testimony in the case at bar.

upon the appearance of his assailant ought to be allowed to prove every fact of which he had knowledge, including his past violent acts, for permitting this proof, said the court, bears upon the "reasonableness of the defendant's apprehension of danger at the time of the homicide." 161 P. at 773.

In *Mortimore v. State*, supra, we approved the decision in *People v. Harris*, 95 Mich. 87, 54 N.W. 648 (1893), where the Michigan court held that it was competent to show past acts of violence which were likely to affect the mind of the accused or to warrant his apprehension of danger. We quoted the Michigan court as follows:

" 'Suppose that the defense could have shown that the accused had been informed of the fact, or had had personal knowledge of the fact, that in another encounter the deceased had brutally kicked or bitten or choked or stamped upon his antagonist, can it be said that such knowledge or information would not have materially increased his apprehension of danger? * * * His guilt must depend upon the circumstances as they appeared to him, and his mental condition must necessarily be materially affected by any knowledge he possessed of the physical strength or violent temper of the deceased, or his violence when in anger.' " 161 P. at 773.

See also *State v. Goettina*, 61 Wyo. 420, 158 P.2d 865, 875 (1945), and *State v. Velsir*, 61 Wyo. 476, 159 P.2d 371, 161 A.L.R. 220 (1945), to the same effect.

Even as in *Mortimore v. State*, where we find a 17-year-old boy shooting a brutalizing father who was in the act of choking the defendant's brother, in this case a 16-year-old boy shot and killed his father as he "stomped" up the driveway in a familiar manner which the accused testified he believed was a prelude to another beating.[12] In each instance, the Wyoming courts have permitted the jury to know about the past violent acts of the victim of which the defendants were aware—this for the purpose of permitting the jury to decide whether or not the behavior of the accused was reasonable in the self-defense sense of the word. But there is a singular difference between Mortimore and Jahnke. In *Mortimore*, the assailant was in the very act of choking his son when the defendant shot and killed his father, and, once the jury became familiar with the past violent acts of the deceased which were known to young Mortimore, the case presented the usual, ordinary and understandable self-defense situation. The scenario became one which could readily be comprehended by lay jurors because they were then confronted with a fact situation which was within the realm of their understanding according to their life's experiences.

In this appeal, however, we do not have defensive behavior with which the lay juror is naturally familiar, and yet a doctor of psychiatric medicine was denied the opportunity to testify that Richard Jahnke's behavior was that of a battered individual whose consequent perception of the imminence of danger is different than the perception of the nonbrutalized person and who would have explained how the battered person responds to danger. Here, unlike with young Mortimore, the father was not engaged in the process of apparently choking another human being. Here, the victim was "stomping" up the driveway in a familiarly menacing way into the face of the fears and anxieties of his son whom he had beaten for 14 years and who recognized the "stomping" as a preface to violence. Here, we have a boy who, from long experience, had come to know what to expect from this confrontation—who believed he would be beaten or would be killed by gun—who did not try to escape because he did not believe that he had any place to go and who did not feel that he could leave his sister unprotected—who taught his sister to fire the gun in case his father should kill him—all in what he believed to be his only defense against further savagery which he knew from past experience would surely

---

**12.** This belief is corroborated by the transfer-hearing testimony of Dr. McDonald as told to him by the accused during medical diagnosis in preparation for trial, supra this dissent. Such medical testimony falls within the Rule 803(4) hearsay exception. See discussion infra.

come. Could a jury understand this behavior as falling within the requirements of the self-defense instruction without help from an expert psychiatric witness? The asking of the question is to answer it.

Therefore, in the *ordinary* self-defense situation where there are no psychiatric implications and where the jury is permitted to know what the accused knew about the violent character of his victim, there need be no expert testimony touching upon the reasonableness of the defendant's behavior. In normal circumstances, these are things that jurors can fathom for themselves. However, when the beatings of 14 years have—or may have—caused the accused to harbor types of fear, anxiety and apprehension with which the nonbrutalized juror is unfamiliar and which result in the taking of unusual defensive measures which, in the ordinary circumstances, might be thought about as premature, excessive or lacking in escape efforts by those who are uninformed about the fear and anxiety that permeate the world of the brutalized— then expert testimony is necessary to explain the battered-person syndrome and the way these people respond to what they understand to be the imminence of danger and to explain their propensity to employ deadly force in their self-defensive conduct. Given this information, the jury is then qualified to decide the reasonableness of a self-defense defendant's acts at the time and place in question.

### The Beating Evidence

The beatings administered by the elder Jahnke against his family members are not described in the majority opinion but they need describing because their presence is central to the viability of Richard Jahnke's plea of self-defense. This is so because they speak to the question which asks whether Richard, at the time and place when he shot and killed his father, reasonably believed it necessary to use deadly force to prevent imminent danger or great bodily harm to himself and his sister. It is also necessary to recount the beating testimony for the purpose of evaluating the necessity and admissibility of expert psychiatric testimony to show whether the mental and physical mistreatment Richard Jahnke suffered made it reasonable for him—under all relevant circumstances—to behave as he did.

### The Trial Testimony of Richard's Mother (Summarized from the record)

Maria Jahnke, the wife of the deceased father and mother of Richard and Deborah Jahnke, testified that on November 16, 1982, the night Richard shot his father, she and Richard had argued. The father came home, heard about it and started "to beat up on my son." She begged the father to leave Richard alone. She was crying, and the father told Richard that

"* * * he wanted him to get out of the house or he was going to get rid of him."

Richard's 15-year-old sister Deborah came to his defense and the elder Jahnke called her "bitch" and "pimple-face" and told her to go to her room. The father then went to his room and got a gun out of the holster. Maria and her husband were going out for dinner, but before they left the elder Jahnke pinned Richard down on the floor and "he punched him."

The mother had observed the father punching and slapping the boy since the child was two years old—

"* * * punch him or slap him on the head and punch him in the back, slam him against whatever was around."

On the night in question, Richard's father called him a "bastard" and said "he wasn't worth anything, that he was useless." He had been saying this to the children ever since they were little. The name-calling and striking might happen every day for awhile and then there would be a period when he would not physically confront the children. He treated Mrs. Jahnke the same way—usually in front of the children. He would call her a "spick, a slut—all kinds of bad names." When Richard found his father beating upon his mother on one occasion in Arizona, he came to his mother's defense and the father got up from where he had the mother pinned to the floor, caught Richard, and beat him up "very

badly." He pinned him down and kept punching him "on the head, on the back." Richard had been the primary focus of her husband's assaults ever since he was a little boy. The boy

"would cry and scream and run into his room."

Sometimes the elder Jahnke would chase him and pin him down and beat him. As Richard got older, the father would punch him harder. He would hit him with a closed fist

" * * * [a]s hard as he could possibly hit him. * * * On his back and his head."

There came a time when Richard reported to his mother that the father was "fondling my daughter, and I told him I already knew about it." The daughter had already reported it to Mrs. Jahnke and she had spoken to her husband about it.

The Jahnke boy had trouble with his grades and reported to his mother that he could not concentrate because of what was going on at home. He was referring to

"[m]y husband's violence toward him."

November 16, 1982 was

" * * * a violent day, as usual, and my husband was beating up on my son. And my daughter came and she punched her father in the shoulder and said to leave her brother alone, that she was tired of seeing him be so cruel to him."

On this occasion,

"He was punching him with both of his hands, and he had him pinned down in the family room and he was really hurting him very badly."

Richard was being punched in the back and in the head.

May 2, 1982 was a memorable day in the Jahnke family, because her husband was "beating up on my son," and told him to go to clean the basement. Then Mr. Jahnke went down to the basement and beat the boy again. The witness heard Richard crying, and then the boy left. He called later to tell his mother he could not stand it any more and that he was going to go to the sheriff. Richard did report the father to the sheriff, and they went to the sheriff's office, where they met with an officer and a social worker, after which they all went home. The father said he would never forgive Richard for reporting him to the sheriff.

On cross-examination, in describing the remarks made by her husband to her son the night her husband was killed, Maria Jahnke testified:

"Q. Is that what you meant when you are saying he said to Richard, 'I'm going to get rid of you,' meant he was going to, he told Richard that he was going to find another place for him to live if he didn't like living at home? Is that what you are—

"A. No. He was going to throw him out of the house, and when he said—

"Q. Well, now—

"A. Meant get rid of him. He was trying to frighten him and to maybe do something else besides just throwing him out of the house."

Mrs. Jahnke testified that she was afraid to go to the authorities about the beatings her husband gave her and the children because he threatened her with telling the authorities what a bad mother she was and that the authorities would take her children from her. The witness testified that one of the worst beatings the elder Jahnke had ever given Richard was in Arizona when he beat him all over the body with a belt with "all of his strength." The day in May when Richard went to the sheriff's office, he had received a beating which was just as bad as that which he had received in Arizona, and he was, on this occasion, taken to a doctor where pictures were taken of his bruises.

Mrs. Jahnke was not sure whether her husband was carrying a gun on the night of the shooting. However, she testified:

"He always carried a gun. When he carried his badge, he carried his government gun; and when he wasn't—off duty, then he would take one of his guns."

On the night of his death, when they were out to dinner, Mr. Jahnke told her

how much he hated the kids. For the first time in his life, Mr. Jahnke discussed the possibility of seeking counseling for his problem with his family relations.

### The Trial Testimony of Richard Jahnke (Summarized from the record)

The witness identified a picture which was taken May 2, 1982. It was a picture of his back with bruises over it as a result of his father beating him. The father first slapped him a few times because he accused him of lying about his homework—then he dragged him by the hair and pushed him and told him to clean up the basement. The father came down the stairs, where he called him a "goddamn bastard" and accused him of not doing his job right, whereupon he threw Richard to the floor, pinning him down, and started pounding him on the back, face and head. He was hitting with his open hand and fist "as hard as he could." It hurt the boy "inside"—

"It hurt me mentally because he hated me so much."

This sort of thing had happened all his life. When he was a little boy, his father would beat him for leaving the tub dripping. All his life the father would hit him "whenever he could," Richard said, "because, I was such a bastard and he was so ashamed of me."

The father would use a leather belt to whip Richard when he was a small child for doing things like "walking with my mouth open."

"He just loved hitting me anyplace with it, in the face, arms, legs, back."

When the boy pleaded for the father to stop, "he hit me harder." The elder Jahnke would only stop these beatings when his high blood pressure caused a nosebleed and his heart to pound.

Mr. Jahnke would beat other members of the family, including Mrs. Jahnke. Once, when Richard was little, it made his father mad when his mother asked him to drive to the store, and he saw him grabbing the mother and

"* * * throwing her up against furniture, putting her down on the ground and pounding her."

On these occasions, he would hide in the closet or under the bed because he was afraid. When he was 10 or 11, he became disgusted with himself because he thought he should be protecting his mother. Richard testified that on one occasion

"I remember watching him. He had my mother pinned down, her face to the floor. He had his knees on her head. He had her pinned. He was just punching her and punching her. She was pleading and she was slobbering because she was crying. She was pleading for him to stop. He was telling her, 'Shut up,' as loud as he could say it. 'I guess you don't like this?'

"And I couldn't take it. It hurt too much to just watch that.

"Q. Tell us how it hurt, Richard.

"A. It hurt so much.

"Q. Tell us how it hurt, Richard. He was beating your mother. Why would that hurt you?

"A. Because it was for no reason, because—to hurt her.

"Q. Why would that hurt you, Richard?

"A. I loved my mother."

One time, when Richard was five or six, he broke a toy boat and the father came screaming after him. "Where is that bastard?" the father yelled, and the mother stood in front of the closet door where she had hidden the boy. For this, the husband beat her up, calling her a "slut," a "fat spick," and saying she was a "terrible mother." After this beating, the boy's father took him out of the closet and beat him.

He saw the father beat his sister the Saturday before the November 16 experience. One time he observed his father put his hands down Deborah's pants. "He was feeling her out." The boy described this conduct on the part of his father this way:

"Q. Could you see your sister?

"A. Yes.

"Q. Did you see how she looked?

"A. She looked so scared. She was stiff. She was shaking. And Mom was pretending like it wasn't even anything.

"Q. What do you mean, Richard?

"A. She saw it but was just going on and cooking.

"Dad would do a lot of things. Like when she would be taking a shower, he'd always have to walk in the bathroom to see how the shower was running. His excuse would be—or there was something wrong with the pipes, see if it's okay.

"And when he disciplined her, he would push her up against the doors, rub her breasts, grope her breasts.

"And Deborah would talk to me about it. She told me she was scared.

"Q. Richard, did you see anything else?

"A. One time—

 * * * * * *

"Q. What else did you see between your father and your sister, Richard?

"A. At nights, for a period of time, my dad would tuck Deborah into bed. I remember one time I looked into the room. I saw my dad laying on top of my sister.

"Q. What did you think when you saw that, Richard?

"A. At first I thought oh, he's just playing a game, playing around.

 * * * * * *

"Q. How did you feel when you saw that and how did you feel when you saw those other things you testified to?

"A. I felt disgusted. I knew it was wrong for my father to stick his hands down her pants. At first I thought why is he doing that. I remember when my sister and I talked. She said—

"Q. Richard, did you ever try and stop that? Did you ever tell anyone?

"A. I talked to my mother about it.

"Q. And did it stop?

"A. My mother got angry at my sister, told her that it was her fault for wearing all those shorts. She said that it was my sister's fault for all that. And she told my sister, 'Just tell Dad "No," tell him not to touch you.'

"And my sister did.

"Q. She told your father not to touch her?

"A. Yeah. I was not in the—"

Richard had asthma, and his father would get mad because the child had to cough, and on these occasions would hit him in the mouth. The father would hit the boy and scream at him if he did not eat all of his food at the dinner table. He also made the children eat with plastic table utensils because he said that the ordinary knife and fork made too much noise.

Richard testified to the May 2, 1982 incident again. He had been beaten by his father in the basement, whereupon he told his father that he would not go hunting as they had planned. He said:

"I'm not going on a hunting trip with you. You're such a crazy lunatic you'd probably kill me."

And then, the father returned to where Richard was and beat him some more. He then told him that if he did not like the way he was being treated to leave home:

"Get the hell out of the house. If you don't like it here, leave."

Richard grabbed his shoes and ran barefooted out of the house to the ROTC instructor's home. He consulted with the instructor and called his mother and told her that he was going to the sheriff. The boy called the sheriff and then went down to his office and they said they would call the elder Jahnke. Richard objected, because, he said, he was afraid his father would kill him.

The father, mother and sister came to the sheriff's office, where the family was shown to a room out of the presence of the officers, and the boy testified that his father was furious and yelled, "You're ruining my marriage, you bastard." Richard testified:

"And I stood up and I said, 'I'm not the cause of your marriage being like this. Was it my fault your marriage—when you were beating on me when I was a

little baby, beating on my sister, beating on my mother? Now you are going to blame me for the marriage that you have.'

"And he said, 'I don't care whatever happens to you. Just get the hell out of here.'"

Richard returned home that day because he was afraid they would put him in jail or a detention home, and he was afraid that if he were not there for his father to punish, he would "take out his frustrations" on his sister and his mother.

Soon after this incident, a social worker came to the house and, according to Richard, his father told lies about him but he was afraid to correct them because he was afraid his father would beat him again.

Richard related a conversation on a hunting trip when his father said:

" 'You know what, Richard, in my job I have to handle a lot of ass-holes, a lot of ass-holes, but I handle it just fine. When it comes to family, I don't know. It's just—I lose it.' He said, 'One of these days, Richard, I'm just going to hit someone so goddamn hard it's going to kill them and they'll deserve it.' And then he looked at me, glared, as if he was saying, 'You are that person, Richard.'

"Q. Is that what you felt, Richard?

"A. Yes. After that I was—I didn't go on anymore shooting trips with him because I was afraid.

"Once before I noticed everytime I was shooting a pistol or something he would have his pistol ready, he would have it in his hand and loaded, standing aside. I was always worried that he was going to shoot me because he hated me so much."

On one occasion, Richard was beaten by his father after the incident at the sheriff's office, and his father went to attend to his nosebleed, when Richard said:

" 'If you didn't hate me so much, it really could have been great, Dad. We could have been friends.'

"Q. Speak up, Richard.

"A. I said, 'We could have been friends, but it's too late now. I will never forgive you for all that you've done to me. It's too late. We'll never become friends. We are forever enemies now.' "

On the Saturday before the shooting, the elder Jahnke had slapped and pushed Deborah. Richard heard her fall down, whereupon he came out of his room and saw his dad "grab Deborah by her hair," and he was "hitting her." He yelled, "Leave my sister alone, bastard," whereupon the father started to chase Richard. Richard felt proud that he was able to help his sister. He admitted that he had often thought of shooting his father after being beaten

"[b]ecause he was so evil."

"He hated us so much. All he had was hate."

When asked why he didn't just leave, he answered,

"Where am I to go? There's no place to go."

He was afraid to tell his teachers or friends about the beatings that his father gave his family members and he was afraid they would not believe him.

On the night of the shooting, Richard and his mother fought. He wanted a ride to school for an open house. She got mad, blamed him for ruining her marriage. "She was telling me that I was a bastard." Suddenly, Richard struck the table and said, "Shut up." Then she "really got angry" and threw a can of dog food at him, which hit him. He hugged her, but she "kept on exploding." When her husband got home, she said to him, "I can't take it any more Richard, they're such bastards," and then she started crying, telling him that "I was really nasty to her, saying that it's all my fault." The father then "came stomping down" to Richard's room and started hitting him.

Richard Jahnke then responded to the following examination in this way:

" 'Being disrespectful to my wife?' Started hitting me. He says, 'You asshole. If you don't like it here, get the hell out.' He told me, 'I don't care what I have to do.' Said, 'I don't care what I have to do. I'm going to get rid of you.

I don't know how, but I'm going to get rid of you, you bastard.'

"That's when my mother and my sister came to my room and she said, 'Where he's going, I'm going, too.'

"And he went and screamed at her, said, 'Shut up, you slut,' and came after her to hit her. I got in the way. I don't know how I did it. He just stomped off down the hall. I told her to get in the room and lock the door. I went in my room and locked the door.

"Then he came back in a little while, pounded on my door, told me to clean up 'that goddamn mess' I made in the kitchen.

 * * * * * *

"He started hitting me again. I wasn't going to be hit. So I was pushing him away, grabbing his fists, I was dodging. He was able to hit me a couple times.

"And my mother came into the room and it looked like Dad was ready to stop hitting me. She said, 'Oh, and he called me a martyr, too.' She was taking pleasure in watching me being hit.

"And then Dad told me to go into the kitchen and clean up the grape juice. He stood in the way, stood in the door—

"Q. Couldn't hear you, Richard. What?

"A. He stood in the doorway so I would have to go through him so he could hit me a couple more times.

"I gathered my courage. I got hit a couple times. I went to the kitchen, started cleaning up the mess.

"He was on the other side of the house. There was an argument between my father and my sister. I don't know exactly what happened, what was said. I just remember Dad saying, 'Shut up, filthy slut.'

"My mother was there. I had been down and cleaning all the mess. And she was smelling the flowers that he got her. It was their 20th anniversary since they first met. She looked so pleased and so peaceful. When he came back she hugged him—

"Q. Hugged who?

"A. She hugged my father. She goes, 'Oh, you are so good to me. I love you.' And he said, 'Let's go to dinner. I can't stand the sight of these bastards.'

"So they got their coats and they got their shoes together, got them on. And Mom walked out the door. Dad, just before he was going to leave, he came back and he shoved me up against the wall and he told me, 'I'm disgusted with the shit you turned out to be. I don't want you to be here when I get back.'

"They left."

After the mother and father left, he thought about being trapped in a brutalized situation from which there was no escape—how his sister was unable to get away from this treatment—how Deborah had been planning on college as "her way out" but was not going to be permitted to leave home for college. After his parents left, Deborah was crying and shaking, and he said:

"Don't worry, Deborah, he's never going to hurt you again."

He testified he felt he had to protect his sister and his mother from the beatings, that he had nowhere to go, he could not go to the sheriff because "[t]hey didn't believe me the first time," and he felt that his dad would be able to talk his way out of it if he went there. He could not go to his ROTC instructor, because he went there once and this individual had

"* * * told everybody about what had happened to me and he was very pompous towards me. At that time we were enemies."

Richard therefore felt he could not trust his ROTC instructor.

When asked why he just did not run away, he said he could not:

"* * * I would have probably starved to death some place. I didn't have any place to go. There was no one out there. Not even my grandparents would have helped me. No one."

Richard Jahnke then described the scenario which saw him place his father's guns around the house for backup. He taught Deborah how to use one or two of

them. He put all the dogs and cats in the basement so they would not get hurt. He thought his father would kill him if he missed him the first time because he thought his father was carrying a gun. He closed the garage door. He described what he was thinking about while he was doing these things—what his feelings were. He thought about

"All the pain he had caused me all my life.

"Q. How did you feel?

"A. I felt hurt, felt angry. I felt scared.

"Q. Scared of what?

"A. Of doing it, what would happen if I didn't do it.

"Q. What did you think would happen? Tell us, Richard.

"A. I thought he would kill me, maybe he might not kill me mentally—physically. He would have killed me mentally.

"Q. What do you mean by that?

"A. All these times, all that pain he gave me, everytime I would just forgive him and forget.

"Q. Describe that pain for us, Richard.

"A. Helplessness, the pain of disgust towards yourself. My father's son was going to be a man for the first time in his life.

"My dad always taught me to stand up for myself. I remember times he would even hit me and tell me, 'Go ahead. You can get the first shot. Look. I'm open. Go ahead. Hit me. Defend yourself.' I never would. He would always laugh at me.

"Q. Why wouldn't you defend yourself, Richard?

"A. I was scared.

"Q. Scared of what?

"A. That he'd hurt me really bad, he would kill me. He was a huge man compared to me. When he was angry he was strong. When he lost his temper he showed no mercy.

"Q. Was this what you were thinking about while you were in the garage, Richard?

"A. Yes.

"Q. What happened while you were in the garage?

"A. I was in the garage, I was thinking of all that had happened to me.

"Q. Speak up, please, Richard.

"A. I was thinking of all that had happened to me and I saw the Volkswagon drive up. Dad turned into the driveway and he turned off all the lights to his car and the motor, just coasted into his park place.

"I saw—I said, 'Oh, my God. Am I really going to do it? I can't.' I said, 'I can't do it. No. I can't do it.' But as my dad walked toward the garage door I thought, 'If I don't do it, he'll see all the guns around the house.' First I thought, 'Well, I'll just drop all the guns, and when he opens the garage door I'll just hug him and I'll tell him, 'Dad, we need help. I need help.'

"Q. Why didn't you do that, Richard? Why didn't you just do that?

"A. I remembered when I hugged him when he was beating me. I told him I loved him, that we have got to stop that. He just kept hitting me and beating me for it. And I thought, 'He's going to see me with all these guns.' He used to get really mad even if anyone anyone would touch his guns. 'Here I've got them laid all over the house. He'll beat us for sure.'

"Then I said, 'No. He's never going to touch any of us again.'

"I remember I had this whistle, my command sergeant major's whistle. Used it for courage. At the last second I became a battalion command sergeant major. It was tough. I was a tough person. Don't take any shit from anybody. I remember I learned that from ROTC.

"I blew that whistle. I opened fire and every shot that I fired hurt me so much. It hurt almost as if I was getting shot also.

"Q. Did you see your father walking up to the garage?

"A. Yes. I remember he was stomping. When he stomped down the hall when he

was really mad and really prepared to beat someone up, beat on one of us. I remember being a little kid, just sitting in my room. My dad stomping after me to hit me, that I could never stop him. "This time I stopped him."

### The Proffered Testimony of the Forensic Psychiatrist

Dr. McDonald, a forensic psychiatrist, was offered by the defendant for the purpose of testifying about the behavior of battered children—that Richard was a battered child—all as an aid to the triers of fact with respect to their obligation to decide whether or not this defendant—as a battered person—behaved reasonably on the night of November 16, 1982, but the court would not permit the jury to hear the testimony.

The defendant suggests that his offer of proof represented that Dr. McDonald would testify that:

1. The doctor had diagnosed Richard Jahnke as a battered child, based on interviews with him and upon other information.

2. Battered children behave differently from other children, and perceive things differently from other children.

3. Because he was a battered child, Jahnke reasonably believed himself to be in immediate danger on the night he shot his father, and perceived himself as acting in self-defense.

In view of the ·way that the majority opinion resolves the psychiatric-testimony issue (infra), it is necessary to examine the defendant's offer of proof and the trial judge's response.

### The Defense Attorneys' Offer of Proof

At the trial, the attorneys for Richard Jahnke offered the testimony of Dr. McDonald, a forensic psychiatrist, for the purpose of providing a backdrop for the jury's decision as to the reasonableness [13] of Richard Jahnke's behavior on the night of November 16, when he shot his father. In

making his offer of proof to explain that to which Dr. McDonald would testify, the defense attorney represented to the court that the testimony was being offered to prove or disprove

"* * * * *the reasonableness of the apprehension of Richard Jahnke on the night in question."* (Emphasis added.)

The issue of "reasonableness," argued the defense counsel,

"* * * * would go to the fact that * * * Richard Jahnke was brutalized by his father in May of 1982, that he was brutalized by his father on November 16th of 1982, that he had been brutalized by his father for many years in the past."

At another point in the offer, defendant's attorney submitted that the doctor would testify that it was his opinion

"* * * * that Richie Jahnke is emotionally impaired, that he believes that Richie Jahnke is a battered child."

The defendant's attorney explained that the doctor should be allowed to testify concerning what Richard Jahnke told him during the course of the doctor's examination for the reason that Richard's statements would go to

"* * * * the reasonableness of Richard Jahnke's apprehension of harm on that evening * * *."

This offer says to me that the doctor's testimony would have supplied such underlying psychiatric information as would have permitted the jury to resolve the issue of reasonableness in an intelligent and informed manner. Even if the offer is read to say that the testimony would have touched on the ultimate issue of the reasonableness of the defendant's behavior at the time and place in question, this is no longer prohibited—at least within the context of the law of this case. See "The Ultimate Issue—Invading the Province of the Jury," infra this opinion, and particularly Rule 704, W.R.E., infra. In *Ibn-Tamas v. United States*, D.C.App., 407 A.2d 626, 628 (1979), a battered-person self-defense case, the court said:

---

**13.** As "reasonableness" is contemplated by the

law of self-defense.

" * * * As to the first—the 'ultimate facts' or 'ultimate issue' rule—Dr. Walker was not going to express an opinion on the ultimate question whether Mrs. Ibn-Tamas actually and reasonably believed she was in danger when she shot her husband. Rather, this expert would have merely supplied background data to help the jury make that crucial determination. See *United States v. Hearst*, 412 F.Supp. 889 (N.D.Cal.1976) (*Hearst I*). In any event, the ultimate issue rule has, over time, been reduced to a prohibition only against questions to an expert 'which, in effect, submit the whole case to an expert witness for decision.' [14] Id. There is no such risk here."

### The Transfer-Hearing Testimony

In his offer of proof—which the court rejected—the attorney included the doctor's testimony in the transfer hearing and represented that it was the kind of testimony that would be offered to the jury. The proffered transfer-hearing testimony may be summarized as follows:

Dr. McDonald, an eminent and highly qualified forensic psychiatrist, examined Richard Jahnke seven times between December 13 and December 23, 1982, for a total of 12 hours. Background information was also obtained by Dr. McDonald from the defendant's mother, sister and others who knew him. This included the staff of the Denver Children's Home, where Richard stayed, the ROTC instructor at Richard's high school, and another one of his high school instructors. The doctor also considered the sheriff's reports and material furnished by defense counsel. The psychiatrist did not find Richard Jahnke to be a violent person, in spite of this one act of violence, and he was not a threat to the community. As a child he was shy and lonely, but with no neurotic traits. When he was very young, he entertained thoughts of suicide because his father was constantly telling him how ugly and stupid

he was, but he would fight back when other children picked on him. When he was a child in Arizona, he received poor grades in school, but these improved when he moved to Wyoming. His self-esteem improved when he found an interest in ROTC and assumed leadership roles in this program. In high school, Richard did not use marijuana or other illegal drugs—did not smoke or drink, and he had no history of juvenile delinquency.

The doctor described an extensive background of Richard receiving physical abuse from his father. His earliest memory was of his father beating him, his mother and his sister. Between the ages of four and 12, there was seldom a day without some sort of punishment by his father. The punishment became less frequent between 12 and 15—more like every other day, but there were more beatings when his father used his fists on him. He was beaten with his father's fists every couple of weeks between 15 and 16. He would be beaten for such things as not cleaning the basement the right way—for walking along with his mouth open—for spending too much time polishing his ROTC uniform. At one juncture, the doctor testified that the children were forced to eat with plastic spoons and forks because their father did not like the noise they made while eating with ordinary utensils. Dr. McDonald testified that Richard related that he would be beaten for things like defending his sister. If Richard would react to verbal abuse by changing facial expression, the father would physically abuse him. When Richard and his mother had an argument, she would call him a "bastard" and report him to his father who would beat him.

On May 2, 1982, after a severe beating by his father, he ran out of the house in his bare feet, then put his sneakers on and ran five miles to his ROTC instructor's home. He sat outside the instructor's house, afraid to go in, and was finally discovered

---

**14.** It was this kind of an intent question in a second-degree murder case that we held a psychiatrist could not answer, in *Smith v. State*, Wyo., 564 P.2d 1194 (1977). It would have

" * * * 'in effect [submitted] the whole case to an expert witness for decision.'" 407 A.2d at 628.

there by the instructor. The doctor explained that children who are victims of abuse are often reluctant to report their problems to others. In Richard's case, he believed for many years that child beatings were the normal behavior for a father. He was humiliated by the abuse and even had trouble reporting it to the ROTC instructor with whom he had a close relationship. On this occasion, however, the instructor and Richard went to the sheriff to report the abuse. The family was then interviewed together, and Richard chose to return home rather than go to a foster home, principally because he saw himself as the protector of his mother and sister.

Richard believed the May visit to the sheriff's office was useless even though his father did not beat him for a week or more. When he returned from reporting his beating to the sheriff, he put a chair against his door every night so his father could not get in. A week and a half after the sheriff's incident, the father exclaimed, "That bastard reported me to the Sheriff," and would say things like

"I'll give him something that he can really complain about, that is if he can talk,"

the implication being that he would be in a condition that would prevent him from talking about anything.

Then the abuse commenced again, with the father shoving Richard against the wall, punching him and slapping him around—almost every day. On one occasion, the father said he could handle the difficult people at the Internal Revenue Service (where he was employed) but at home he could not and some day he was going to hit someone so hard he would kill them. As he spoke, he looked at Richard, who believed his father was talking about him.

Richard had seen his father fondling Deborah in a sexual way, and had reported it to his mother, who responded that she already knew it. When she was being abused, the boy also came to the rescue of his mother with a weapon—baseball bat— and he was successful in reducing the times when the father would beat the mother.

Another reason for Richard's fear of his father was his father's habit of keeping a gun at his side constantly. He would take a gun when he went to answer the door— would even take a gun to the bathroom. When he sat down on the couch he would have a gun under his thigh, or alongside when he sat on the floor. One night when Richard was 10, he awoke to go for some food in the refrigerator. He did not turn on the lights, because he did not wish to awaken the family members, but the lights came on suddenly and he found his father with a pistol about eight inches from his face. One time when they were hunting rabbits, the father shot a rifle between two other hunters who held up a white handkerchief, whereupon the Jahnkes fled the scene. Richard knew the elder Jahnke had loaded weapons throughout the house and he was very afraid of his father and what he might do to him either with his fists or with his guns.

In his transfer hearing, the doctor took other factors into account to reach his evaluation conclusion. For example, the beatings and verbal abuse had an adverse effect on Richard's psychological development. He testified that the boy does not have the ability to handle stress that other young people of his age have and any ability he does have in this regard has come about as a developed defensive mechanism against the brutality of his father. That was the problem on November 16, 1982—that is, when his mother turned on him, blaming him for all the trouble with her marriage and in the home generally, and when she kept calling him a bastard and throwing things at him it was too much for him to stand. He felt victimized when his mother reported him to his father that night because she reported things that he had never said about her. This series of events and its repercussions, together with his father's beating him that night and the father's threat that he should leave home, was more than Richard Jahnke could handle. In addition, according to Dr. McDonald, he was afraid of another beating

when his father and mother returned from dinner. Therefore, taking all of these things into account, he was under unusual and, for him, unbearable pressure on the evening of November 16, 1982.

On cross-examination:

The doctor testified that when Richard protected his mother and sister from the elder Jahnke, and after some of the beatings against him, he thought of attacking his father but he did not say he intended to use a weapon. On the night in question, however, Richard was angry with his father, and he told the doctor that he intended to do something about his father's conduct. He told about how he loaded and arranged guns in preparation for his father's return—that his plans were to defend himself. The dialog went like this:

"Q. (By Mr. Carroll) In other words, he told you what his plans were and how he effected his plans in expectation of the return of his father?

"A. Yes. His plans were to defend himself against his father. He thought that his father would beat him up again and beat up his sister, so that first of all he said he didn't really know what he was doing when he went through the house putting the guns in various places. But then he had this fantasy that he was reminded, I think it was of Konan the Barbarian or something, I think he'd seen a film of this man protecting his home, where I take it he had weapons in every room. And so he, in a sense, was thinking that if something went wrong then there'd be a weapon to protect that particular room or he saw it—

"Q. When he said something went wrong, what did he think might go wrong, did he tell you?

"A. If his father fired at him, I take it.

"Q. Pardon me?

"A. If his father acted in a, you know, went on the rampage, that's the way he put it. He thought that his father was armed when he went to the restaurant. I don't think he knew whether he was or not, but he knew that often his father would take a firearm with him when he went out.

"He was afraid that his father was armed, and he was fearful that his father would thump him again when he got back. And so he made up his mind that he wasn't going to let this happen again.

"Q. Did his father—Did he tell you his father made any agressive acts toward him upon his return to the family home that evening?

"A. No, he didn't—He didn't make any aggressive acts other than the way he walked. So far as Richard was concerned, this was the way he walked when a beating was about to take place. He stomped. It reminded him of his father's behavior before beatings. But that was his interpretation, sir.

"Q. Did he tell you that's what provoked him into shooting his father through that closed garage door?

"A. I think that was the thing that, the factor that provoked the shooting."

The witness testified that he was not retreating from his position between two cars in the garage when he fired the shots as the father came "stomping" toward the garage door.

It was his intention that night to also protect his sister—the beatings received by Richard were more severe as he grew older—when he was young it was more often the open hand—later it was the closed fist.

He both loved and hated his father. That night he wanted to go hug his father and say let's forget about this—let's get together and not have these arguments, fights, beatings—but Richard had done that before and he had just received a beating for his efforts at reconciliation. He had this "fleeting magical belief" that it could all be resolved by saying to his father, "[L]et's be friends," "I love you"— that sort of response, but then he remembered that he had just received a beating when he had tried this on other occasions.

*The State's Response to The Defendant's Offer of Proof*

In response to the offer of proof (which included the transfer proceeding), the State

argued that the psychiatric testimony should not be received for these following reasons:

(a) There had been no plea of mental illness or deficiency under § 7–11–304, W.S.1977;

(b) The testimony would be hearsay in view of the fact that it is the evaluation of a psychiatrist who interviewed in preparation for trial and is not the treating physician who is testifying;

(c) The proffered testimony is irrelevant to the issues before the court because the defendant is actually urging diminished capacity which is not recognized in Wyoming and there has been no plea of insanity;

(d) Based on his prior testimony at the transfer hearing, the doctor could not testify to a mental deficiency or disorder even if the plea was insanity, since he did not establish his evaluation as being based upon a recognized standard;

(e) The jury is able to determine intent and should not be aided in this process by a psychiatrist according to our holding in *Smith v. State*, Wyo., 564 P.2d 1194 (1977), for the reason that such testimony would invade the province of the jury.

*The Trial Court's Reasons For Refusal*

With respect to the proffered testimony of the forensic psychiatrist, the trial judge ruled:

"Well, the court isn't convinced that what was stated to Dr. McDonald by the defendant here clearly falls into the hearsay exception.

"And I state that for the reasons that I have previously expressed to counsel.[15]

\* \* \* \* \* \*

"*I haven't been presented any evidence of any court's acceptance of the science*

---

15. The dialogue to which the judge refers is this:

"MR. EPPS: Your Honor, *I believe that under the Wyoming Rules [of Evidence], 803*, it says, 'The following are not excluded by the hearsay rule, even though the declarant is available as a witness.' *A specific exception is 803(5)—excuse me, 803(4), 'statements for purposes of medical diagnosis or treatment.'* "Dr. McDonald has testified that he interviewed the defendant Richie Jahnke for purposes of medical evaluation and diagnosis or treatment. And that one of the things that he needed in order to do that was to get a reading of his family history.

"We would submit to the court that under the hearsay exceptions that is clearly admissible and he is allowed to testify to that.

"MR. CARROLL: *I would concede, Your Honor, that there is that exception to the hearsay rule* if the testimony would be relevant and permissible under the Rules of Law and statutes in this state.

"THE COURT: Well, gentlemen, *I don't think it is admissible under the exception to the hearsay rule, because I think that the rule contemplates that somebody goes to a physician, doctor or psychiatrist, whatever, for treatment before he is involved in something, and that he cannot go after he is charged with a crime and then be treated for and consulted and examined for the sole purpose of having this doctor testify in a trial.*

"*I think you are doing indirectly what you could not do directly.*

"MR. EPPS: Your Honor, if we might have a brief recess—I do not have my copy of the

Federal Rules of Evidence here, which the Wyoming Rules of Evidence were drawn from. But under the Federal Rules they deal specifically with the issue that you've raised, and under the Federal Rules it makes no difference whether or not the person has gone to a physician or a psychiatrist after they have been charged with a crime. That testimony is still admissible under the hearsay exceptions.

"THE COURT: Well, it might be, but *I think it probably would be under a proper plea of not guilty by reason of mental illness* or—but, anyway, I feel that it should not be admissible, because I don't think you have the same guarantees. The guarantee of that is that when a person goes for treatment he tells the doctor the truth, what's bothering him. Under these circumstances I don't think we have that guarantee.

"At any rate, I don't think—*I think it is hearsay* in regard to this matter. I think *what you are trying to present is some sort of mental deficiency. And I know you haven't followed the statutes in that regard.*

"MR. EPPS: Your Honor, *we have made no claim of mental deficiency.*

"THE COURT: *You are doing it indirectly.* "I've just given my ruling. Now, I think you are clearly out of bounds in that regard, and I'm not going to listen to this.

"I will give you a hearing out of the presence of the jury, if you want to go into an examination in depth of this doctor as to what you are going to do so it's all on the record. I will listen to it and I'll hear further argument." (Emphasis added.)

*of the battered child, what can be predicted from the battered child.* I don't believe that Dr. McDonald's testimony is being offered as an admission against interest, although there may be an admission against interest contained in some of the things told to him or alleged to have been told to him by the defendant.

"And Mr. Carroll can't cross-examine the defendant as to what he has told the doctor, so I don't see where cross-examination is the great protector in this instance.

"I believe that the *testimony* and the opinions and conclusions of Dr. McDonald, as suggested by counsel, *would invade the province of the jury.*

*"The jury, I believe, is to determine the reasonableness of any fears, and they should determine that by evidence of a person who testified as to the facts, the situation, and draw their conclusions.* "The court is sustaining the objections of the state to this testimony." (Emphasis added.)

I read the trial court's comments to say that the proffered testimony is refused for the following reasons:

1. The testimony is irrelevant because the defendant did not plead insanity or some kind of diminished capacity;

2. It is hearsay;

3. No foundation evidence of the court's acceptance of the science of the battered child had been introduced;

4. The testimony would invade the province of the jury;

5. Under the facts of this case, the issue of reasonableness is for the jury and is not a proper subject for expert testimony.

### The Insanity Misconception

Both the State and the trial court believed the defendant was urging an insanity or diminished-capacity defense and thus were of the opinion that the proffered testimony was irrelevant

This court has held that evidence of a defendant's mental or emotional condition is admissible whether or not the defendant has pled the insanity defense. In *Fulcher v. State*, Wyo., 633 P.2d 142, 144 (1981), the court said:

"We hold that the trial court properly received and considered evidence of unconsciousness absent a plea of 'not guilty by reason of mental illness or deficiency.'"

While that case dealt with automatism, the reasoning is appropriate to the battered-person syndrome. We noted in Fulcher that automatism could manifest itself in a person with a perfectly healthy mind. 633 P.2d at 145. The defense in this case represented that Dr. McDonald's testimony would have shown that Richard Jahnke possessed the mental status or personality of a battered youth but did not suffer from a mental disorder of any kind. According to the offer, the witness would have testified that, as a group, battered children behave and perceive things in a predictable way, and that Jahnke's fear and apprehension that night were typical for a battered child, thereby leaving the reasonableness of his behavior for jury resolve.

It was thus contrary to Wyoming law for the trial judge to exclude Dr. McDonald's testimony on this basis. Both the express statements and the policy of the Wyoming Supreme Court allow testimony concerning defendant's mental or emotional condition regardless of whether or not he has entered a plea of mental illness. To exclude such testimony was, therefore, erroneous.

The theory of Richard Jahnke's defense was misunderstood by the prosecuting attorney, the trial court and now, I submit, this court. This was indeed a proper case for self-defense, and the offer of proof was made on the recognized grounds that battered children behave differently than other children—their brutalized conditioning mandates that they perceive danger differently—and that this defendant believed, as an abused 16-year-old boy would be expected to believe in these and similar circumstances, that he was in imminent danger

when he shot his father and that he perceived himself to be acting in self-defense. Even so, the county attorney objected to the offer for the reason that this testimony would only be relevant to a plea of insanity—and that no such plea had been lodged here—that the testimony would be irrelevant in the case at bar because the defendant is actually urging diminished capacity when this defense had neither been pled nor is such a defense recognized in Wyoming—that the transfer testimony made clear that the doctor could not testify that the accused was suffering a "mental deficiency or disorder," even if the plea had been insanity. The State's attorney further objected to the offer for the reason that the testimony was being tendered on the question of intent and, he argued, that intent is a matter for the jury's resolution. He supported this latter argument by reference to *Smith v. State*, supra, where we held in this second-degree murder prosecution that the jury does not need the expert opinion of a psychiatrist to testify to intent. See n. 14.

The record reveals that the trial court agreed with these concepts. As has been noted (see n. 5, supra), the judge said that he understood the purpose of the psychiatric testimony was to establish "some sort of mental deficiency" and that the offer might be relevant had the defendant pled insanity but was not relevant where the plea was not guilty by reason of self-defense.

These objections and rulings describe a total misconception of the defendant's theory of his defense and the applicable rules of law with respect thereto. Richard

Jahnke did not offer Dr. McDonald's testimony to establish *insanity* or any form of a diminished capacity; his defense was *sanity*, i.e., the reasonableness of the behavior of a brutalized human being where the plea is self-defense. Furthermore, the proof of the defendant's intent at the time and place in question was not the purpose of the offer, nor was the defendant's intent ever in issue in this case. It was conceded throughout the trial and appellate court proceedings that the defendant *intended* to use deadly force against his father because he believed he was in imminent danger. Whether that belief was the reasonable belief of a battered 16-year-old, sane human being was the issue—not his intent. It appears clear from these objections and rulings that the State and the court misunderstood the theory of Jahnke's defense and, thus, the objections to the offer which hinged on the insanity misconceptions and the intent issue irrelevantly addressed the admissibility of the proffered testimony and were, consequently, erroneous.

In these proceedings, the mental state of Richard Jahnke was not offered as a defense as would be the case with an insanity plea. Neither his mental capacity nor his intent to commit the crime was in issue.[16] Rather, the specific defense is self-defense, which requires a showing that Jahnke reasonably believed it was necessary to use deadly force to prevent imminent death or great bodily harm to himself. In this situation, the expert testimony is offered, when the battered defendant pleads self-defense, as an aid to the jury in interpreting the surrounding circumstances as they affect-

---

**16.** This factor distinguishes the offer in the case at bar from the offer in *Smith v. State*, supra n. 2, 564 P.2d at 1199. There, the defendant was charged and found guilty of second-degree murder. The psychologist was asked about the intent of the accused, and the dialogue went like this:

"'Q In your opinion, doctor, could she have formed the necessary intent, or could she, or did she form an attempt [sic intent] to shoot and kill Dorothy Fancher at that time?

"'A It is my opinion, based upon the tests, personal interviews with her, that she, the morning of what we are questioning, November 14th, had no intent to kill or harm Mrs. Fancher.

"'MR. TSCHIRGI: Well—

"'THE COURT: Just a moment. He is in the middle of his offer. I don't know if he is finished yet.

"'(By Mr. Smith) Will you explain the basis for your opinion?

"'A I have used as the basis for my opinion—to go back and perceive what Mrs. Smith has told me * * *.'

"The doctor then proceeded to outline the same evidence as before the jury."

ed the reasonableness of his belief. The expert testimony offered was secondary to the defense asserted. Given the opportunity, the defendant would not seek to show through the expert testimony that the mental and physical mistreatment which he suffered affected his mental state so that he *could not be responsible* for his actions; rather, the testimony was offered to show that, because he suffered from 14 years of brutalizing, *it was reasonable* for him to have remained in the home—to have prepared to respond to the beating that he had been promised would surely come and to have believed at that time and place that he was in imminent danger.

In *Hawthorne v. State,* supra, 408 So.2d at 806, the court was concerned with the reasonableness of a battered woman's behavior where the plea was self-defense. The State argued—even as did the State in the case at bar—that

> "* * * 'testimony regarding the mental state of a defendant in a criminal case is inadmissible in the absence of a plea of not guilty by reason of insanity.'" Quoting from *Zeigler v. State,* Fla., 402 So.2d 365, 373 (1981).

The State cited as authority the rulings of the Florida Supreme Court where the defense of diminished capacity had been held not to rise to the level of insanity and, in the trial court, psychiatric testimony had been held to be inadmissible. The court, in distinguishing diminished capacity and self-defense, said:

> "* * * We think there is a difference between offering expert testimony as to the mental state of an accused in order to directly 'explain and justify criminal conduct,' [*Tremain v. State,* Fla. 4th D.C.A., 336 So.2d 705, 706 (1976)], and the purpose for which the expert testimony was offered in the instant case. In this case, a defective mental state on the part of the accused is not offered as a defense as such. Rather, the specific defense is self-defense which requires a showing that the accused reasonably believed it was necessary to use deadly force to prevent imminent death or great

bodily harm to herself or her children. *The expert testimony would have been offered in order to aid the jury in interpreting the surrounding circumstances as they affected the reasonableness of her belief.* The factor upon which the expert testimony would be offered was secondary to the defense asserted. Appellant did not seek to show through the expert testimony that the mental and physical mistreatment of her affected her mental state so that she could not be responsible for her actions; *rather, the testimony would be offered to show that because she suffered from the syndrome, it was reasonable for her to have remained in the home and, at the pertinent time, to have believed that her life and the lives of her children were in imminent danger. It is precisely because a jury would not understand why appellant would remain in the environment that the expert testimony would have aided them in evaluating the case."* (Emphasis added.) 408 So.2d at 806–807.

It is because a jury would not understand and would not be expected to understand why Richard Jahnke would remain in that environment and believe that he was in imminent danger that the expert testimony is critical to aid and assist them in evaluating these conditions, circumstances and behavior patterns.

### The Expert's Testimony Was Necessary

The expert's testimony was necessary for the court's and the jury's understanding of Richard Jahnke's theory of defense

In the case at bar, the court denied the defendant's offer to introduce the testimony of the expert when he said:

> "The jury, I believe, is to determine the reasonableness of any fears, and they should determine that by evidence of a person who testifies as to the facts, the situation, and draw their conclusions."

This ruling had the effect of not only rejecting the offer of scientific proof at this stage of the trial but it precluded the offer

of scientific testimony at any other juncture. Once the trial court had held that the jury did not need scientific testimony in order to aid in the decision-making process, as a practical matter that became the final word on this or any other offer of this type of testimony.

It is my judgment that both the court and the jury were in need of explanatory testimony by the psychiatrist and that the court committed reversible error in not admitting it. Since both the county attorney and the presiding judge were trying the case while laboring under the misconception that Richard Jahnke was urging some kind of insanity or mental-incapacity theory, it needed to be explained—not only to the court and county attorney but to the jury—that, while the behavior of Richard Jahnke did not present the ordinary self-defense fact situation, his theory of defense was not concerned with either his intent to commit the act or his mental deficiency.

In *Smith v. State,* supra, this court said: "Expert testimony is appropriate when the subject of inquiry is one which jurors of normal experience and qualifications as laymen would not be able to decide without the technical assistance of one having unusual knowledge of the subject by reason of skill, experience or education in the particular field." 564 P.2d at 1199.

In this case, it was necessary to explain to the jury that, because Richard Jahnke had been the recipient of the battering and brutalizing that this record reveals this young boy had experienced at the hands of his father, his behavior was—from a psychiatric point of view—the expectable concomitant of that kind of treatment. Therefore, scientific explanation was necessary to assist the trier of fact to understand the evidence and determine the essential fact in issue—namely, whether there was a cause-and-effect relationship between the boy's abuse and his behavior and, if there was, whether his conduct was that of a reasonable person behaving in the same or similar circumstances.

While it is conceded—as the majority opinion points up—that the question of expert-testimony admissibility is usually a matter of discretion with the trial judge, the testimony cannot be excluded for erroneous reasons because these types of faulty judgments would not bring the court's exercise of discretion into play. See *Chrysler Corporation v. Todorovich,* Wyo., 580 P.2d 1123 (1978), where we invoked this rule in holding error to prevent cross-examination where the court's reason was erroneous at law. Here, as has or will be seen, the trial court has precluded expert testimony for such erroneous reasons as: There is no need for expert explanation in these fact circumstances; there is no plea of insanity or diminished capacity and thus the testimony is irrelevant; the testimony will invade the province of the jury; and it does not fall within the exception to the hearsay rule. Assuming that these are erroneous reasons for excluding the testimony of Dr. McDonald, it cannot be said that the court has exercised its discretion on any relevant question, including the one which asks whether the testimony will be of assistance to the trier of fact. I would urge that the court's decision on this issue amounted to error as a matter of law, which takes it out of the realm of the abuse-of-discretion rule. At the very least, the rejection of the testimony amounted to an abuse of discretion.

The applicable rules of evidence and pertinent case law say that the battered-person syndrome is a subject that is "beyond the ken" of the lay juror and must be explained through the use of expert testimony. *Ibn-Tamas v. United States,* supra.

Rule 702 of the Wyoming Rules of Evidence, entitled "Testimony by experts," provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Rule 703, W.R.E., entitled "Bases of opinion testimony by experts," provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Doubts about whether an expert's testimony will be helpful in a case should generally be resolved in favor of admissibility unless there exist strong and compelling reasons favoring exclusion such as time or surprise. 3 Weinstein's Evidence, ¶ 702[01], at 702–6. This is so, because the central concern of the rule is: Will the expert testimony

"* * * 'assist the trier of fact to understand the evidence or to determine a fact in issue' "?

It has been said:

"* * * There is no more certain test for determining whether experts may be used than the common sense inquiry whether the untrained layman would qualify to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, *Expert Testimony*, 5 Vanderbilt L.Rev. 414, 418 (1952).

In numerous instances, courts have held it error to have excluded expert testimony in cases of this nature where the proffered testimony goes to the very essence of defendant's theory of defense.

In *United States v. Hill*, 655 F.2d 512, 516 (3d Cir.1981), cert. denied, —— U.S. ——, 104 S.Ct. 699, 79 L.Ed.2d 165, the defendant appealed from a criminal conviction on five counts of distribution of narcotics. He urged that he was induced by government agents to arrange sales of the narcotics. The appeal raises the question of admissibility of expert psychological testimony in an entrapment defense to establish the defendant's unique susceptibility to inducement. As in self-defense, entrapment requires admission of guilt of the crime charged and all of its elements, including the required mental state. *United States v. Watson*, 489 F.2d 504 (3d Cir. 1973).

The *Hill* court held it to be error, under Rule 702, F.R.E. (which is identical to Rule 702, W.R.E.), for the trial judge to exclude the expert testimony because expert testimony concerning a defendant's susceptibility to influence may be relevant to an entrapment defense. *United States v. Benveniste*, 564 F.2d 335, 339 (9th Cir.1977). In *Hill*, the court said:

"* * * An expert's opinion, based on observation, psychological profiles, intelligence tests, and other assorted data, may aid the jury in its determination of the crucial issues of inducement and predisposition. This is the purpose ascribed to expert testimony by Federal Rules of Evidence 702, and it appears most applicable to the instant case. A jury may not be able to properly evaluate the effect of appellant's subnormal intelligence and psychological characteristics on the existence of inducement or predisposition without the considered opinion of an expert.

"Accordingly, if the expert can reach a conclusion, based on an adequate factual foundation, that the appellant, because of his alleged subnormal intelligence and psychological profile, is more susceptible and easily influenced by the urgings and inducements of other persons, such testimony must be admitted as relevant to the issues of inducement and predisposition." 655 F.2d at 516.

The Hill court held that this type of testimony would also be admissible under Rule 405(a), F.R.E. (the same as Rule 405(a), W.R.E.), which provides:

"*Reputation or opinion.*—In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry

is allowable into relevant specific instances of conduct."

Expert testimony has been permitted upon a variety of subjects related to the nature and type of testimony offered here. In *People v. Mathews*, 154 Cal.Rptr. 628, 91 Cal.App.3d 1018, 1022 (1979), an expert was permitted to testify upon the subject of rape-trauma syndrome. The admission of a deputy sheriff's testimony as expert testimony on the subject of street-gang customs was approved in *People v. McDaniels*, 166 Cal.Rptr. 12, 107 Cal.App.3d 898, 904–905 (1980).

In *State v. Anaya*, Me., 438 A.2d 892 (1981), the Maine Supreme Court found that the trial court committed reversible error in excluding testimony related to the battered-woman syndrome. The court said:

"On appeal, we will reverse a decision based on M.R.Evid. 403 to exclude evidence only if the trial justice abused his discretion in so deciding, *State v. Hinds*, Me., 437 A.2d 191 (1981). Interpreting the decision below as one based on Rule 403, we find such an abuse of discretion. Both Dr. Bishop's and Dr. Krueger's testimonies were highly probative and more helpful than confusing to the jury. The record shows that Dr. Bishop would have testified that abused women often continue to live with their abusers even though beatings continue, and that a certain substrata of abused women perceive suicide and/or homicide to be the only solutions to their problems. This evidence would have given the jury reason to believe that the defendant's conduct was, contrary to the State's assertions, consistent with her theory of self-defense. We agree with the District of Columbia Court of Appeals, and various commentators, that where the psychologist is qualified to testify about the battered wife syndrome, and the defendant establishes her identity as a battered woman, expert evidence on the battered wife syndrome must be admitted since it 'may have ... a substantial bearing on her perceptions and behavior at the time of the killing, ... [and is] central to her claim of self

defense.' *Ibn-Tamas v. United States*, 407 A.2d 626, 639 (D.C.1979). Since we cannot say beyond the reasonable doubt required to make the error harmless that this evidence would not have affected the jury's consideration of the self-defense claim, *State v. True*, Me., 438 A.2d 460 (1981), defendant is entitled to a new trial." 438 A.2d at 894.

In a wrongful-death action by the deceased's daughter, the defense introduced the testimony of a psychologist who was allowed to testify in considerable detail as to the emotional state of the defendant and the causes of her condition, based on his interpretations of the facts that she had related to him. He was allowed to testify to the role of the man in a battering situation to demonstrate that the defendant was an abused woman whose actions were caused by a long series of episodes of her being beaten by the victim. *Morrison v. Bradley*, Colo.App., 622 P.2d 81, 83 (1980), rev'd on other grounds, 655 P.2d 385 (Colo. 1982).

In *State v. Baker*, 120 N.H. 773, 424 A.2d 171 (1980), the defendant was charged with attempted first-degree murder of his wife, to which he pled not guilty by reason of insanity. Both the defendant's wife and his daughter testified that he had physically abused them on numerous occasions. The defense called two psychiatrists who testified that the defendant was, in their opinion, legally insane at the time of the crime. In rebuttal, the State called an expert on domestic violence who testified that research did not indicate that mental illness was an important cause of wife-beating, and that, in his opinion, a marriage such as the defendant's would probably fall within the contours of the battered-woman syndrome. The New Hampshire Supreme Court held that the testimony regarding the battered woman was admissible to rebut the defendant's evidence of insanity, noting that many courts have held that testimony concerning the battered-child syndrome is admissible. *State v. Baker*, supra, 424 A.2d at 173.

In *Ibn-Tamas v. United States*, supra, the trial court refused to permit an expert to testify where a battered woman had pled self-defense. In reversing and remanding, the District of Columbia Court of Appeals observed that expert testimony is properly excluded if it will be addressed to a subject with respect to which the jury is just as competent to consider. *Lampkins v. United States*, D.C.App., 401 A.2d 966, 970 (1979). According to the *Ibn-Tamas* decision, expert testimony is admissible if it treats with subject matter which is "beyond the ken of the average layman." The court reviewed the facts of the case, analyzed the offer of proof, pointed out the difference between the battered-woman's plea and the ordinary plea of self-defense and concluded that the expert testimony would have

"* * * enhanced Mrs. Ibn-Tamas' general credibility in responding to cross-examination designed to show that her testimony about the relationship with her husband was implausible; and * * * it would have supported her testimony that on the day of the shooting her husband's actions had provoked a state of fear which led her to believe she was in imminent danger ('I just knew he was going to kill me'), and thus responded in self-defense." 407 A.2d at 634.

The testimony, said the court, would have supplied an

"* * * interpretation of the facts which differed from the ordinary lay perception ('she could have gotten out, you know') advocated by the government. The substantive element of the Dyas [infra] test —'beyond the ken of the average layman'—is accordingly met here." 407 A.2d at 635.

The court then concluded that the exclusion of the proffered expert testimony was reversible error.

Thus, it can be readily seen that this kind of expert testimony in the form of either scientific or other specialized knowledge will assist the trier of fact, and the purpose of such testimony will be to give the jury a basis for considering whether the defendant suffered from the battered-person syndrome, not in order to establish a "special justification for patricide"[17] but as it relates to his or her claim of self-defense.

### The Ultimate Issue Invading the Province of the Jury

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Rule 704, W.R.E.

In rejecting the offer of the expert's testimony, the trial court said:

"I believe that the testimony and the opinions and conclusions of Dr. McDonald, as suggested by counsel, would invade the province of the jury."

In Comments, *Wyoming Rules of Evidence 701–706, Opinion and Expert Testimony*, 13 Land and Water L.Rev. 975 (1978), the author points out that the ultimate-facts rule has been rejected and criticized uniformly by all commentators. The author says:

"However, commentators have been uniformly outspoken in their criticism of the ultimate facts rule. Wigmore called it empty rhetoric and 'one of those impracticable and misconceived utterances which lack any justification in principle'. McCormick said it was 'unfairly obstructive' and illogical. Weinstein called it 'the cause of many foolish reversals and still more foolish appeals.' And Morgan termed it 'sheer nonsense.' More specifically, the rationale for the rule was often questioned. As more than one commentator has pointed out, there can be no invasion of the province of the jury, for the jury has the power and the duty to judge the credibility of all witnesses, the weight to be given each opinion, and to reject outright any opinion which is inadequately supported."

17. The majority suggest that Richard Jahnke seeks to urge some kind of "special justification" for "patricide."

For the reason that the ultimate-facts rule proved to be a failure, this court has abolished the rule completely, providing the opinion testimony is helpful to the trier of fact and a suitable subject for the expert. See also, *Tabatchnick v. G.D. Searle & Company*, D.N.J., 67 F.R.D. 49 (1975).

In *Smith v. State*, 247 Ga. 612, 277 S.E.2d 678, 18 A.L.R.4th 1144 (1981), the court had under consideration the question which asked whether an expert's opinion regarding the "battered woman's syndrome" was admissible where the defendant pled self-defense or was properly excluded on the basis that the expert's opinion as to fear of a battered woman and this defendant in particular was the ultimate fact to be decided and hence invaded the province of the jury. Concerning this issue, and noting that the opinion of experts in battered-woman-syndrome cases had been received without argument, the court said:

"Concerning the rule that an opinion should not be allowed which would 'usurp the functions of the jury', Wigmore wrote in 1940 that it is so misleading and unsound that it should be entirely repudiated, and concerning the rule that an opinion should not be allowed 'on the very issue before the jury', Wigmore said that it is another erroneous test, impracticable, misconceived, and lacking any justification in principle. VII Wigmore on Evidence, 3rd ed., §§ 1920, 1921, pp. 17–19 (1940).

"Following Wigmore's criticism, the rule was reexamined. Rule 409 of the Model Code of Evidence proposed by the American Law Institute in 1942 reads as follows: 'An expert witness may state his relevant inferences from matters perceived by him or from evidence introduced at the trial and seen or heard by him or from his special knowledge, skill, experience or training, whether or not any such inference embraces an ultimate issue to be decided by the trier of fact. . . .'

"Since 1942 there has been a trend to abandon or reject the rule with the result that now in a majority of states an expert may state his opinion upon an ultimate fact, provided that all other requirements for admission of expert opinion are met. \* \* \*

"Rule 704 of the Federal Rules of Evidence which went into effect in 1975 provides that 'Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.' However, this rule eliminates a ground for exclusion, does not in and of itself provide for the admission of opinion testimony, and is qualified by other rules including Rule 702 which provides that: 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.' Thus, under the federal rules opinion testimony as to the ultimate issue is admissible if it will assist the trier of fact to understand the evidence or determine a fact in issue. *United States v. Scavo*, 593 F.2d 837, 844 (8th Cir.1979); Moore's Federal Practice, Federal Rules of Evidence, 1981, Part 2, pp. 204–205." 277 S.E.2d at 680–681.

Following a full discussion of the issue, the court reversed the judgment of the trial court which excluded the testimony with this holding:

"We hold that the correct rule is as follows: Expert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman. [Citations.] See also Code Ann. §§ 38–1708, 38–1710. This holding is in accord with the modern view as exemplified by Rules 702, 704 of the Federal Rules of Evidence, *supra*.

"The trial court in this case applied this rule but found that the jurors could draw

their own conclusions as to whether the defendant acted in fear of her life. We disagree and find that the expert's testimony explaining why a person suffering from battered woman's syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself, would be such conclusions that jurors could not ordinarily draw for themselves. Hence we find that the expert's opinion in this case was improperly excluded from the jury's consideration." 277 S.E.2d at 683.

Since Wyoming has abolished the ultimate-facts rule and the issue in controversy was one where the opinion would have been helpful—in fact imperative to sensible jury resolution—it was error for the court to have rejected the testimony and opinion of Dr. McDonald for the reason that it embraces an ultimate issue to be decided by the trier of fact.

### The Hearsay Error

In the course of rejecting the doctor's testimony, the court said:

"THE COURT: Well, gentlemen, I don't think it is admissible under the exception to the hearsay rule, because I think that the rule contemplates that somebody goes to a physician, doctor or psychiatrist, whatever, for treatment before he is involved in something, and that he cannot go after he is charged with a crime and then be treated for and consulted and examined for the sole purpose of having this doctor testify in a trial." [18]

Rule 803(4), W.R.E., provides:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

＊　　＊　　＊　　＊　　＊　　＊

"(4) *Statements for purposes of medical diagnosis or treatment.*—Statements made for purposes of medical diagnosis or treatment and describing

medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

The trial court concluded that statements made by Jahnke to Dr. McDonald in preparation for trial did not fall within the exception to the hearsay rule embodied in Rule 803(4).

Rule 803(4) clearly encompasses statements made to a doctor for purposes of "medical diagnosis," even though the doctor's diagnosis was obtained solely for use at trial. The Advisory Committee's Note to the identical federal rule indicates that Rule 803(4), F.R.E., changes prior doctrine to the contrary:

"Conventional doctrine has excluded from the hearsay exception, as not within its guarantee of truthfulness, statements to a physician consulted only for the purpose of enabling him to testify. While these statements were not admissible as substantive evidence, the expert was allowed to state the basis of his opinion, including statements of this kind. The distinction thus called for was one most unlikely to be made by juries. The rule accordingly rejects the limitation."

The broad scope of Rule 803(4) was emphasized by the Court of Appeals in *O'Gee v. Dobbs Houses, Inc.*, 570 F.2d 1084, 1088–1089 (2nd Cir.1978), where the plaintiff did not call treating physicians as witnesses, but called instead the doctor whom plaintiff consulted for litigation purposes more than four years after the accident. The court said:

"Prior to the adoption of the Federal Rules of Evidence, a non-treating doctor such as Dr. Koven would have been permitted to recite his patient's statements to him, not as proof of the facts stated, but only to show the basis of his opinion. ＊ ＊ ＊ The Federal Rules, however, rejected this distinction as being too esoter-

---

**18.** It is to be remembered that even the prosecuting attorney conceded this testimony fell within the hearsay exception. The State's argu-

ment was that it was not relevant (since there was no plea of insanity)—not that it did not qualify as a hearsay exception.

ic for a jury to recognize." 570 F.2d at 1089.

It may be that the judge in the instant case held reservations about admitting a criminal defendant's possibly self-serving statements to a psychiatrist. However, modern courts have generally held that statements by the accused to a psychiatrist hired for trial purposes come within Rule 803(4). *United States v. Sims*, 514 F.2d 147 (9th Cir.1975), cert. denied 423 U.S. 845, 96 S.Ct. 83, 46 L.Ed.2d 66; *Kibert v. Peyton*, 383 F.2d 566 (4th Cir.1967); Annot., 55 A.L.R.Fed. 689, § 5; 4 Louisell & Mueller, Federal Evidence § 444, pp. 610–612. Any concerns about the lack of candor of the defendant in relating information to the psychiatrist or about the speculative nature of the psychiatrist's diagnosis may be developed through cross-examination and ultimately resolved by the jury.

For the above reasons, and under cited authority, it was error to reject the proffered testimony as not coming within the Rule 803(4), W.R.E. exception to the hearsay rule.

### The Majority Opinion

For the reasons previously outlined, it is my view that the majority opinion is in error in holding with the trial court that the doctor's proffered testimony was inadmissible as a Rule 803(4) exception to the hearsay rule. Furthermore, and for all of the reasons indicated, the opinion is faulty in supporting the trial court's holding the testimony not to be relevant to the defense of self-defense and would only be pertinent where the plea was insanity or diminished capacity, and I have explained my position on this point in detail. Given Rule 704, W.R.E., and authorities cited supra, it is error for the majority to acquiesce in the court's rejection of the offer for the reason that the opinion would invade the province of the jury. I take issue with the majority's abuse-of-discretion holding to the effect that the trial court did not abuse its discretion when it held the proffered expert testimony to be inadmissible. In this regard, I have undertaken to show, with numerous citations, that, since the battered-person syndrome does not fall within the life's experience of the average juror, the exclusion of this kind of testimony is erroneous as a matter of law, and its rejection should therefore not be subject to an abuse-of-discretion consideration. If, however, this rule is said to be applicable, I would hold the court to have abused its discretion. In any event, in the case at bar, the trial court did not actually exercise its discretion because its rulings were made for legally erroneous reasons, i.e., hearsay, only relevant in an insanity proceeding—invasion of the province of the jury—the subject was within the understanding of the fact-finders without professional assistance, etc. See *Chrysler Corporation v. Todorovich*, supra.

Having disposed of these various propositions—at least to my satisfaction—I turn to that section of the majority opinion which treats with and upholds the trial court's rejection of the proffered expert testimony on the ground that there was no self-defense testimony before the court when the offer was rejected. The majority reason that this is so because there was no "actual or threatened assault" evidence in the record and therefore the reasonableness of Richard Jahnke's behavior was not in issue.

The majority puts the proposition this way:

" * * * This record contained no evidence that the appellant was under either *actual or threatened assault* by his father at the time of the shooting. *Reliance upon the justification of self-defense requires a showing of an actual or threatened imminent attack by the deceased.*" (Emphasis added.) 682 P.2d at 1006.

The opinion goes on to say:

" * * * Absent a showing of the circumstances involving *an actual or threatened assault* by the deceased upon the appellant, the reasonableness of appellant's conduct at the time was not an issue in the case, and the trial court, at the time it made its ruling, properly ex-

cluded the *hearsay* [19] testimony sought to be elicited from the forensic psychiatrist." (Emphasis added.) 682 P.2d at 1007.

These assumptions and conclusions, besides containing errors of law (discussed infra),[20] either overlook the fact that the transfer-hearing testimony was made a part of the defendant's offer of proof or they do not conceive that the testimony of Dr. McDonald in the transfer hearing contains such evidence of threat or assault as would call into question the reasonableness of the defendant's behavior. Certainly the transfer testimony contains evidence of what Richard Jahnke as a battered person *could have reasonably believed* was an actual or threatened imminent assault thus calling into issue the reasonableness of his conduct—and, as the offer of proof would have shown, *he did believe* himself to be threatened and in the process of being assaulted when the shots were fired.

As an example of the defendant's perception of the assault and imminence of danger to both him and his sister—even though repetitive—it is to be remembered that the following was elicited on cross-examination at the transfer hearing:

"Q. (By Mr. Carroll) In other words, he told you what his plans were and how he effected his plans in expectation of the return of his father?

"A. [By Dr. McDonald] Yes. *His plans were to defend himself against his father. He thought that his father would beat him up again and beat up his sister,* so that first of all he said he didn't really know what he was doing when he went through the house putting the guns in various places. But then he had this fantasy that he was reminded, I think it was of Konan the Barbarian or something, I think he'd seen a film of this

man protecting his home, where I take it he had weapons in every room. And so he, in a sense, was thinking that if something went wrong then there'd be a weapon to protect that particular room or he saw it—

"Q. When he said something went wrong, what did he think might go wrong, did he tell you?

"A. If his father fired at him, I take it.

"Q. Pardon me?

"A. If his father acted in a, you know, went on the rampage, that's the way he put it. *He thought that his father was armed when he went to the restaurant. I don't think he knew whether he was or not, but he knew that often his father would take a firearm with him when he went out.*

"*He was afraid that his father was armed, and he was fearful that his father would thump him again when he got back. And so he made up his mind that he wasn't going to let this happen again.*

"Q. Did his father—*Did he tell you his father made any aggressive acts toward him upon his return to the family home that evening?*

"A. No, he didn't—*He didn't make any aggressive acts other than the way he walked. So far as Richard was concerned, this was the way he walked when a beating was about to take place. He stomped. It reminded him of his father's behavior before beatings.* But that was his interpretation, sir.

"Q. *Did he tell you that's what provoked him into shooting his father through that closed garage door?*

"A. *I think that was the thing that, the factor that provoked the shooting.*" (Emphasis added.) [21]

---

**19.** I have previously discussed the "hearsay" question. Under Rule 803(4), W.R.E. and relevant cited authority, the testimony of Dr. McDonald was not excluded by the hearsay rule.

**20.** It is not necessary in order to mount a viable self-defense response that there be "an actual or threatened assault by the deceased" as the majority opinion holds. *Parker v. State,* supra nn.

3 and 6; *State v. Radon,* supra n. 3, discussed infra in detail, and the law of the case as contained in the given instruction, supra.

**21.** This transfer testimony was incorporated in the offer of proof and it falls within the exception to the hearsay rule under Rule 803(4), W.R.E.

As I have noted, it seems clear to me that the majority misstate the Wyoming law of self-defense and the law of this case on self-defense when the opinion assumes that, for self-defense to be a viable protection in a criminal prosecution in this state, the defendant must be under "an actual or threatened assault" before the reasonableness of his conduct will raise a self-defense issue. As has been mentioned nn. 3, 4 and 6, the assault, the threat and the imminence of danger must only be of such a character as to create, in the mind of the defendant, a reasonable belief that the danger is imminent and that it is necessary to use deadly force against his assailant in order to protect himself from death or great bodily harm. *Parker v. State*, 24 Wyo. 491, 161 P. 552, 555 (1916); nn. 3 and 6, supra; and the given instruction on self-defense, supra.

Perhaps this concept is best exemplified in our opinion which reverses the trial court in *State v. Radon*, 45 Wyo. 383, 19 P.2d 177 (1933). In that case, the following instruction was given:

" 'The jury is instructed that in order to excuse the defendant on the ground of self-defense, *there must be some act* or declaration *at the time of the killing of the person on the part of the deceased to kill him or to do him great bodily harm.* To constitute self-defense the belief or apprehension of danger entertained by the defendant must be founded on sufficient circumstances to authorize the opinion, in a reasonable mind, that the deadly purpose entertained by the deceased then existed, and the fear that it will at the time be executed.' " (Emphasis added.) 19 P.2d at 181.

The court found this instruction and another instruction which held:

" '*The danger* which will justify the killing of a human being *must be actual,* present and urgent, and appear to a reasonable mind to be actual, present and urgent' " (emphasis added), 19 P.2d at 181,

to be reversible error, according to the following analysis:

Referring to the first of these instructions, the court said:

" * * * The first part of the instruction refers to declarations of the deceased at the time of the shooting. The defendant did not claim that the deceased made any such declarations at the time of the homicide and reference thereto was not in accordance with the evidence. The rule which the court, perhaps, had in mind in giving the instruction is that stated in 30 C.J. 64 as follows:

" 'But it is necessary that he (the deceased) shall have indicated by some overt act or hostile demonstration at the time of the killing a real or apparent intention to kill or inflict great bodily harm upon accused and thereby induced the latter to believe on reasonable grounds that he was in imminent danger and that it was necessary to kill and save himself.'

\*　　\*　　\*　　\*　　\*　　\*

"*Some act, of course, had to take place to give the appearance of danger, and to give the defendant reasonable ground therefor. But an actual assault or attack on the defendant was not necessary, if the circumstances gave reasonable ground for apprehension of imminent danger.* 30 C.J. 64. In the case at bar the deceased walked toward the defendant. He had a package in his hands, wrapped in paper. That, apparently, turned out to be a pair of gloves. Still, while there is no specific evidence of the size of the gloves, how the deceased held the package, and whether it gave the appearance that it contained a gun or other dangerous weapon, *the defendant says that the attitude of deceased put him in fear,* evidently intending to convey the idea, in his broken accent, *that he thought that the deceased was carrying a deadly weapon, and we are not prepared to hold that, as a matter of law, in view of previous difficulties and threats, he might not have had reasonable ground to believe that he was in imminent danger, even though the deceased was not guilty of any actual*

*assault.* But the instruction given by the court—leaving out of consideration the reference to a 'declaration,' seems to require such actual assault, for to say that the deceased must have done some act *to kill the defendant* [emphasis in original] can mean nothing else than that he was then engaged in an attack which, if carried out, would have resulted in death or great bodily harm. The second sentence of the instruction does not modify the first, but treats of circumstances creating an apprehension of danger as a separate matter. This is also true of instruction No. 16, in which the court said:

" '*The danger* which will justify the killing of a human being *must be actual,* present and urgent, and appear to a reasonable mind to be actual, present and urgent.'

"*Here the jury were told, without the possibility of misinterpretation, that there must be not only apparent danger, but also actual danger, in order to justify the killing on the ground of self-defense. There was no actual danger in the case at bar. The deceased had no gun or other dangerous weapon with him.* Hence the question of self-defense was substantially taken away from the jury by these instructions. That, we think, was prejudicial error. *The theory in the case at bar was that there was an apparent danger, not actual danger. Where the evidence presents that theory, as in the case at bar, an instruction which limits the right of self-defense to actual or real danger alone is erroneous.* 30 C.J. 377." (Emphasis added.) 19 P.2d at 181–182.

I must say parenthetically that I admit to some confusion with respect to the majority's position on the law of self-defense in this case, because, as has been noted, the opinion says that there must be evidence of an "actual or threatened assault" before the reasonableness of defendant's behavior may become an issue for the fact-finder where the accused urges self-defense. However, the majority, while refusing to embrace our historic self-defense rule as exemplified in *Parker v. State,* supra and *State v. Radon,* supra, undertake to support their theory of "actual or threatened assault" with a quotation from *State v. Thomas,* 66 Ohio St.2d 518, 423 N.E.2d 137, 139 (1981), where the Ohio Supreme Court said:

"In a trial such as this one, where the evidence raises an issue of self-defense, the only admissible evidence pertaining to that defense is evidence which establishes that *defendant had a bona-fide belief she was in imminent danger of death or great bodily harm,* and that the only means of escape from such danger was through the use of deadly force." (Emphasis added.)

Indeed, the *Thomas* rule is that for which I contend and it is the rule which is the law of this case according to the uncontested self-defense instruction, i.e., the defendant must have had "a bona-fide belief that [he] was in imminent danger." This is different than saying that there must be an "actual or threatened assault" before the fact-finder may consider the reasonableness of the accused's purported self-defensive behavior.

It would, therefore, be my conclusion that, for all the reasons set out in the battered-person citations contained in this dissenting opinion, the majority opinion errs when it assumes that there was no self-defense evidence in the record at the time the offer was made, and I would also urge that the majority misstate Wyoming's law of self-defense as well as the law of the case on that point. *Parker v. State,* supra; *State v. Radon,* supra; and the self-defense instruction given in this case, supra.

Lastly, the majority opinion takes issue with the fact that the offer of proof does not meet the state-of-the-art criteria for the reception of battered-person expert testimony as set out in *Dyas v. United States,* D.C.App., 376 A.2d 827, 832 (1977), cert. denied 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977) and adopted by our *Buhrle v. State,* Wyo., 627 P.2d 1374

(1981). It is urged by the majority that it was not shown by Dr. McDonald's testimony that the battered-person theory had progressed to that place in the scientific scheme of things where a reasonable opinion can be asserted by an expert as to how a battered person perceives the imminence of danger and responds thereto. The majority hold that once the offer of proof was rejected—for whatever reason—the defense team should have recalled the doctor at some future point in the proceedings in a further effort to establish the state-of-the-art requirements, failing which the offer was fatally defective for not having shown the court that the battered-person syndrome had reached adequate acceptance in the psychiatric medical community.

In response, I suggest the following:

This opinion has pointed out that the purpose of the defense offer of proof was to explain the battered-person syndrome—that Richard Jahnke was a battered person—and to explain how battered people perceive and respond to the imminence of danger. ·It would then have been a question for the jury to determine whether or not, as a battered person, the defendant behaved reasonably in the self-defense context. Counsel repeated this thought on numerous occasions during the offer-of-proof proceedings. He grounded his offer on the representation that the doctor would testify that Richard was a battered child, that battered people behave differently than those who have not lived with the battering experience and that he would explain the fear and anxiety complex which battered people have with respect to their battering assailants. This offer leaves the clear impression that the introduction of this evidence would be submitted for the purpose of aiding the jury in determining the reasonableness of Jahnke's acts on the night in question. Even though the offer incorporated the transfer testimony for

these purposes, the court denied the offer for these following reasons:

(1) Irrelevant since insanity was not pled;

(2) Did not fall within the exception to the hearsay Rule 803(4), W.R.E.;

(3) The testimony would invade the province of the jury; [22]

(4) No testimony has been submitted upon "the acceptance of the science of the battered child";

(5) The subject is not one which requires explanation of an expert.[23]

I suggest that it is judicial game-playing to say that, even though the court had already held that the doctor's testimony was inadmissible because it was hearsay—that it would only be admissible in an insanity defense, that it invades the province of the jury, and that the subject was not of a nature which requires expert explanation, it was, nevertheless, necessary to prove the scientific acceptability of the battered-child syndrome in order to avoid a state-of-the-art error.

What good would it have done? I can hear the judge saying to defense counsel upon the occasion of such proffered reoffer:

Why are you taking up the court's time with this kind of proof? I have ruled for a number of reasons that this testimony will not be admitted, no matter what the state of the art of the battered-child syndrome might be shown to be—the evidence is, counsel, inadmissible for the reasons stated, and I will not hear any further testimony on this subject.

In my judgment, and as a practical matter, it would have been an exercise in futility to have belabored the subject further.

Lastly, with respect to the state-of-the-art issue, I would hold that the testimony in question is being recognized and admitted in a majority of jurisdictions in this country because it is central to the defense

22. In spite of Rule 704, W.R.E. and appropriate citations supra.

23. The court said:

"The jury, I believe, is to determine the reasonableness of any fears, and they should determine that by evidence, of a person who testifies as to the facts, the situation, and draw their conclusions."

of the battered person who pleads self-defense—as is shown by the numerous citations of authority in this opinion—and therefore it was error as a matter of law to have excluded the testimony for the reason that there was inadequate foundation proof on this subject.

Even if we were to assign the same importance to this issue [24] that the majority does, this court is obligated, in my opinion, to remand the case to the trial court for the purpose of supplementing the record in this regard. *Ibn-Tamas v. United States,* supra.

For the reasons stated, I would have held that the defendant did not commit error by not reoffering Dr. McDonald's testimony on the state of the art of the battered-person syndrome.

For the reasons set out in Justice Cardine's dissent—in which I join, and for the reasons set out in this dissenting opinion—in which he joins, I would have reversed and remanded for a new trial.

CARDINE, Justice, dissenting, with whom ROSE, Justice, joins.

I dissent and join in the dissent of Justice Rose to the extent that it holds that the manner in which a battered child perceives his situation as that relates to self-defense is an appropriate subject for expert testimony and that such testimony should have been received.

In this case appellant, a sixteen-year-old boy, admitted the killing claiming only that his state of mind, resulting from a lifetime of beatings and physical and mental abuse, caused him to be in a state of fear and apprehension under which he acted in self-defense. Self-defense by a victim of abuse is as lawfully available as a defense in patricide as in any other homicide.

There is no description of the beatings and abuse in the majority opinion. For that reason and because they are necessary to an understanding of this dissent, they are set forth now. Appellant testified to specific instances of beatings and abuse that he could remember, beginning approximately when he was five or six years old. Some of the instances he recounted were: If he made noise at dinner or scraped his fork on his plate, he was hit and knocked off his chair. Once, at age five or six, he was given a rubber boat which broke when he was playing with it. His father was enraged, searching for him, threatening to beat him, and his mother hid him in a closet and protected him. He was punished almost daily. If the faucet in the washtub was found leaking, he received a beating. He was beaten in the face, arms, legs, and back with a belt for such things as walking around with his mouth open; and as Richard Jahnke testified,

> "[a]nd I pleaded for him to stop. He told me, 'Shut up, you crying baby. I'll really give you something to cry about.' And he hit me harder."

When he was young, he had asthma and necessarily coughed frequently. His father would hit him for coughing and he would hold back the cough as long as he could. When his father felt his teeth were not white enough, he took a toothbrush, told him he would show him how to brush, and brushed his teeth until his gums bled. He and his sister were both subjected to the teeth brushing; and when his sister was maturing and her face broke out, she was scrubbed with a rough rag until her face would bleed. Richard Jahnke was mentally tortured and humiliated by being called names such as leather lips, sissy, being told he was "no good," "worthless," and cursed frequently.

24. At n. 23 of *Ibn-Tamas v. United States,* supra, the court says:

"Although the third criterion adopted by this court in *Dyas,* supra, requires the trial court to evaluate the proffered expert's methodology by reference to the degree of 'general acceptance in the particular field in which it belongs,' *Frye,* supra, 54 App.D.C. at 47, 293 F. at 1014, the 1972 edition of McCormick on Evidence, supra, encourages courts, in considering scientific evidence, to ignore the third test, relegating any disagreement in the scientific community to the weight, not admissibility of the testimony. See id. at § 203." 407 A.2d at 638.

One of appellant's weekly chores was to clean and mop the basement. He testified that his father would make a mess in the basement deliberately so that he would have to clean it. On Sunday, May 2, 1982, his father yelled at him, slapped him, dragged him by the hair and pushed him down the basement stairs with orders to begin cleaning. His father then came to the basement, began beating on him, hitting him with his fists, shouting at him, and finally telling him to get out of the house; to leave. Richard grabbed his shoes, began running from the house barefoot. His father stood in the way, as he often did, so he could hit him a couple more times as he left. Richard ran barefoot to a neighbor's house, but was too embarrassed, confused, and humiliated to even knock on his neighbor's door. He sat on a curb in front of his neighbor's house crying for approximately three hours. The neighbor then came out of his house, noted Richard had been crying, asked what was wrong, and was told the entire story. He observed bruises and marks on Richard's back and arms from the beating, took him to the sheriff's office where reports were made out. Richard's family was called and they all came to the sheriff's office where they were put in a room together to discuss what had happened. He then went back home with his family. Shortly thereafter, a social worker called at the house. He talked to the family as a group, but not with Richard separately as was standard procedure in the agency. When Richard was asked about what had happened, his father was always present glaring at him; and he finally said everything was alright. The social worker, as he left the house, walked out on the front lawn with the father and talked to him privately for about ten minutes. When the father came back into the house, he was smiling as though he had won; and Richard felt he had failed and there was nothing he could do.

Things were better for a short time and then the abuse and the beatings started again. On the Saturday before this incident, the father, Richard Chester Jahnke, beat his daughter Deborah for not combing her hair. Then, on November 16, 1983, there was the family argument described in the majority opinion. Richard Jahnke was beaten again, threatened, and told not to be in the house when the father returned from dinner. When his father returned home, an hour and a half later, his homicide resulted.

The court was advised, prior to commencement of trial, that appellant contended he acted in self-defense in killing his father and wished upon voir dire,

"* * * to ask the panel whether or not there are any individuals seated on the panel who feel that there's no justification ever for the taking of a human life."

In chambers, before commencement of the trial, the following transpired between the court and counsel:

"[THE COURT:] * * * [A]nd the court has instructed counsel that it is the court's opinion that during the selection of the jury that defense of self-defense or any other defense need not be mentioned * * *."

Appellant's counsel then advised the court of another area he wished to explore on voir dire and stated,

"There is an area in this case with regard not only to physical abuse but mental abuse, and I would like to have the latitude to inquire of the jury * * *. We do have an element of mental abuse where it is our evidence and our assertion that the children are—very young age—put down, if you will, sworn at, cussed at.

"And I need to know and would like to be able to inquire as to whether or not people on that panel feel * * * that sort of conduct or treatment is beneficial or harmful.

 * * * * * *

"There is an impact from conduct other than physical abuse, and I would like to be able to inquire into that area of the panel.

 * * * * * *

"THE COURT: Well, I would not allow you to inquire because I think that opens up everything that the court wants to exclude during the voir dire.

"I will allow you to ask them individually how they discipline their children or how they did discipline their children. * * * "

The court then advised counsel as follows:

"Gentlemen, I'm going to instruct the jury that the purpose of voir dire examination is not to make an advance, favorable portrayal of the case of one side or the other, but rather to insure the parties of a trial by an impartial jury, that is, by qualified jurors who have no bias or prejudice * * * ."

Appellant's counsel responded as follows:

"Well, Your Honor, it would be, with all due respect, it would be our contention that there's no way to determine whether they have that bias or prejudice unless we can question specifically in these areas.

\* \* \* \* \* \*

"For the record, I understand the ruling of the court. For the record, I would like to enter an objection to that restriction because I feel it impairs and interferes with our ability to determine that in this particular case where there is a considerable amount of underlying emotional impact, even to the people who have to consider whether they can fairly and impartially judge this case, and it takes some soul-searching on their part.

"I believe the only way I can effectively do that is to specifically inquire.

"But I understand the court's ruling. I do disagree, but would like to enter an objection at this time.

"THE COURT: It's on the record."

The court began the proceeding by instructing the jury upon the purpose and method of conducting voir dire. At this time, a motion in limine seeking to restrict voir dire had been filed by the State and not ruled upon by the court. The filing of the motion and failure to rule is of no effect, for surely voir dire is not controlled by the State through unruled-upon motions in limine. The court asked the jury if they would follow the law as given by the court, informed them that the State carried the burden of proving the defendant guilty, and that they should assume the defendant innocent unless convinced of his guilt beyond a reasonable doubt. These were non-specific, general questions and statements propounded to the jury panel as a group. For the most part, they were instructions to the jury, not calculated to develop information at all. The questions that were asked were innocuous and of a kind that result in the same one-syllable answer from each juror. For example, if a juror is asked if he will follow the law, without knowing any specifics, he will say "yes." But his answer might be different if the juror felt the taking of human life could never be justified. Perhaps he could not follow the law relative to self-defense.

The court next asked each juror to state their name and furnish certain basic information concerning employment, marital status, ages of children and background information. Voir dire was then turned over to the respective attorneys.

The prosecuting attorney's voir dire covered one hundred pages of the transcript of testimony. The voir dire of defense counsel, because of the extreme limitations placed upon him, was reported in just sixteen pages of transcript. Appellant's counsel was permitted to ask on voir dire just one question of the jury, i.e., how they disciplined their children. When jurors responded they spanked them, the voir dire was finished. Counsel was not permitted to make inquiry concerning juror's feelings about self-defense, whether there would ever be a justification for killing another human being in the mind of a juror, their feelings about mental and physical abuse, and how that might affect one's state of mind or reasonable apprehension of fear, and whether any of the jurors might have a bias or prejudice in any of these areas that would prevent appellant receiving a fair trial or the juror being able to judge impartially.

The right of a defendant in a criminal case to a jury free of bias and prejudice is guaranteed by Art. 1, § 10, Wyoming Constitution which provides:

"In all criminal prosecutions the accused shall have the right * * * to a * * * trial by an impartial jury * * *."

The same right is guaranteed to the defendant by the Sixth Amendment to the Constitution of the United States. This court has accepted as a fundamental principle the proposition that parties to an action are entitled to a fair and impartial jury. *Lopez v. State,* Wyo., 544 P.2d 855 (1976). To accomplish that purpose, it is essential that a litigant be permitted to develop all relevant and material matters which might form a basis, not only for a challenge for cause but also such as would permit him to intelligently challenge peremptorily. *State v. Brown,* Mo., 547 S.W.2d 797 (1977); 47 Am.Jur.2d Juries § 195.

In addition to challenges for cause provided by statute, appellant was entitled to exercise eight peremptory challenges pursuant to Rule 25(b), W.R.Cr.P.[1] It is recognized that bias and partiality may exist that do not meet the statutory requirements of a challenge for cause. The peremptory challenge then covers an area that is not encompassed by the challenge for cause, is exercised for reasons known only to counsel and his client, and is not under control of the court.

Common sense tells us that peremptory challenges were intended to provide an additional safeguard to the required fair trial. They cannot be exercised in a vacuum or by guess and conjecture and accomplish this purpose. The litigants, therefore, should have as full knowledge as possible of prospective jurors to permit an intelligent decision in the selection process.

Therefore, I am convinced that the better rule is stated as,

" * * * The purpose of voir dire is to assure that the defendant's right to a jury free of interest, bias or prejudice is

protected * * * [and] [v]oir dire works to protect that right not only by providing the basis for challenges for cause but also by providing a basis to 'enable a litigant and his counsel to exercise reasonable judgment in utilizing peremptory challenges.' * * * " *State v. Peacher,* W.Va., 280 S.E.2d 559 (1981).

A litigant at the voir dire stage of the proceeding has the burden of demonstrating bias or prejudice or establishing the grounds for the exercise of his challenges. Thus, in *Lopez v. State,* supra, we said:

" * * * It is the obligation of the defendant to examine jurors on voir dire and discover by proper investigation facts affecting their qualifications, and then to seasonably raise that objection with respect to any member of the panel. * * " 544 P.2d at 861.

In *Lopez v. State,* supra, unlike the case at bar, defendant had the opportunity to voir dire the panel with respect to significant issues of the case but failed to do so. Similarly, in *Keffer v. State,* 12 Wyo. 49, 73 P. 556 (1903), defendant chose to withhold the character of his defense on voir dire and we held:

" * * * The accused was under no obligation to disclose the character of his defense at this stage of the proceedings [voir dire examination]; but, if he chose to hold it in reserve, he cannot complain that the examination did not * * * disclose whether any [of the jury] had formed any opinion in regard to it. * * " 12 Wyo. at 65, 73 P. at 559.

This case presents the same issue but from a different perspective. Defendant here did not choose to withhold his defense and in fact requested of the court on several occasions an opportunity to voir dire the jury concerning specific matters of his defense. The court, although fully informed as to appellant's defense, limited the scope of voir dire to such an extent that it was

---

1. Rule 25(b), W.R.Cr.P., provides in part:
"(b) *Peremptory challenges.*—In every case * * * [i]f the offense charged is punishable by imprisonment for more than one (1) year, each defendant shall be entitled to 8 peremptory challenges. * * "

meaningless. This was an abuse of discretion for,

" * * * [w]here a trial court's restriction of the scope of voir dire undermines the rights sought to be protected by the voir dire process it will be held to be an abuse of discretion and reversible error." *State v. Peacher*, supra, 280 S.E.2d at 570.

Neither do I agree with the majority in holding that the sterile, broad, general questions directed to the jury by the court inquiring whether they could "follow the law" cured this error. Again in *State v. Brown*, supra, it was stated:

" * * * [The] general question did not cover defendant's proposed inquiry about the critical issue of the state's burden to disprove self-defense.

" * * * [I]t is clear defense counsel made known to the trial court he wanted to learn if the veniremen's minds were open or closed to the principle that the burden of proof would be on the state to disprove self-defense. This was vital to the defendant's right to have an unbiased jury. The trial court erred in barring defendant from exercising this right." 547 S.W.2d at 800.

Voir dire is probably the least understood and most poorly developed of all the trial skills. Judges often feel that it is misused and wasteful of time; that counsel attempt upon voir dire to establish a rapport with the jury, argue their case, and condition or prepare the jury for damaging evidence and difficult concepts. Perhaps some of this cannot be avoided even in a proper voir dire examination, and it surely occurs anyway during the course of the trial. In any event, we know that voir dire has an honest and legitimate purpose that no fair-minded person would dispute. It should be the desire on the part of all those involved that the jury selected should be one with as little bias, prejudice, or preconceived notions or opinions about the principles and concepts involved in the particular case as is humanly possible.

It has been suggested that counsel improperly attempt to select jurors favorable to their cause. That cannot happen for jurors are drawn at random and then excused peremptorily or for cause if not qualified. With experienced, competent trial counsel the prosecution surely will challenge and strike those jurors favorable to the prosecution. The jurors left who will hear and try the case should be those with the least bias, prejudice or opinions about the facts of the case and what the result ought to be. But this system can only work if counsel, though questioning of the jurors on voir dire, is able to gain sufficient knowledge that challenges can be exercised intelligently. That requires some latitude in permitting an effective and reasonable voir dire structured to develop the attitudes, opinions and feelings of the panel of jurors from whom the trial jury will be selected.

Some of the questions appellant's counsel wished to propound to the jury were proper. Some were improper and the court properly sustained objections to them. For instance, appellant's counsel advised the court that he wished to inquire of the jury if they felt it proper for a father to lay on top of his daughter, feel her breasts, and put his hands into her panties. What was the purpose of the question? If it were allowed, what would the response be? Surely every juror, no matter what his personal feelings, would have answered that question in just one way—with a "No." If counsel already knew what the answer of each juror must be to that question, why did he wish to ask it? It reveals nothing about bias or prejudice. Clearly it was intended to incense the jury, was argumentative, and sought a commitment from them beforehand. It was an improper question. When a question directed to the jury is one that must be answered by all of the jurors in the same way, it usually is not a question that will develop any information helpful in ascertaining whether bias, prejudice or preconceived notions about the case may exist with those jurors. The question is generally one that seeks a commitment from the juror or is in the nature

of argument and is, therefore, objectionable.

On the other hand, when appellant sought to ask jurors whether any of them felt there is no justification under any circumstance ever for the taking of human life, it was proper. This was a question that jurors might answer differently because of religious or personal beliefs or feelings they might have about taking the life of another. There are those who might feel there is never any justification under any circumstance for the taking of human life. Appellant was equally entitled to know how jurors felt about physical and mental abuse and the effect that might have on a child from the age of five until he reached sixteen years of age. Appellant claimed he acted in self-defense. His state of mind and his apprehension of fear under all of the circumstances was an important element of his defense; and how jurors might feel about that defense or whether they could accept it or even consider it was vital in jury selection. If there were those on this jury, who because of personal feelings, religious belief, upbringing or training could not accept or consider self-defense as a justification for this homicide, then appellant did not receive a fair trial.

The trial court instructed the jury on the law of self-defense. This then became the law of the case. The jury could have found under the instructions of the court that appellant reasonably believed he was defending himself when the killing occurred. We can never know if there were those on appellant's jury who held beliefs that would not permit them to make this finding or accept this defense.

The appellant asserts that the trial court's action in limiting the scope of inquiry on voir dire made it impossible to effectively and adequately exercise his peremptory challenges thereby violating his right to due process of law and effective assistance of counsel. I find merit in appellant's argument. It was an abuse of discretion for the trial court to deny appellant the opportunity to voir dire prospective

jurors as I have outlined. I would, therefore, reverse and remand for a new trial.